# Exhibit "A"

# State Court Action filings

# Exhibit "A"

Electronically Filed
4/19/2021 5:32 PM
Steven D. Grierson
CLERK OF THE COURT

**COMP**
G. MARK ALBRIGHT, ESQ. (#001394)
JORGE L. ALVAREZ, ESQ. (#014466)
**ALBRIGHT, STODDARD, WARNICK & ALBRIGHT**
801 South Rancho Drive, Suite D-4
Las Vegas, Nevada 89106
Tel:  (702) 384-7111
Fax: (702) 384-0605
gma@albrightstoddard.com
jalvarez@albrightstoddard.com

CASE NO: A-21-833155-C
Department 15

and

Jonathan A. White, Esq.
Washington Bar No. 45442
**GRANITE SPIRE LAW GROUP, PLLC**
2003 Western Ave. Ste. 345
Seattle, WA 98121
T: (206) 494-3224 / F: (206) 770-7507
jwhite@granitespirelaw.com

*Attorneys for Plaintiffs*

## EIGHTH JUDICIAL DISTRICT COURT

## CLARK COUNTY, NEVADA

| | |
|---|---|
| JUDY SABELLA, individually, and TIMOTHY SABELLA, individually, | CASE NO.: |
| | DEPT. NO.: |
| Plaintiffs, | |
| vs. | |
| WYNDHAM VACATION RESORTS, INC.; JOHN DOES 1-50, and ROE CORPORATIONS 1-15, inclusive. | **COMPLAINT** |
| Defendant. | |

Plaintiffs, JUDY SABELLA and TIMOTHY SABELLA (Collectively the "Sabellas" or "Plaintiffs"), allege as follows:

## **PARTIES**

1. Judy and Timothy Sabella are a married couple living in Grand Valley, Pennsylvania.

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

2.   Defendant Wyndham Vacation Resorts (hereinafter "Defendant" or "Wyndham") is a Delaware corporation with its principal place of business in Florida.

3.   Wyndham has business and real estate licenses in Nevada.

4.   Wyndham is a timeshare "Developer" as defined by NRS § 119A.040.

5.   Plaintiffs are ignorant of the true names and capacities of the Defendant sued herein as Does 1 through 50 and Roe Corporations 1-50, and therefore sues these Defendant by such fictitious names.  Plaintiffs will amend this Complaint to allege their true names and capacities when ascertained.

6.   Plaintiffs are informed and believe, and based thereon allege, that each of the Defendant are, and at all times relevant herein were, the agents, servants, alter-egos, employees and representatives of the other Defendant sued herein, and that in doing the things hereinafter alleged, were acting within the course and scope of such agency and/or employment.

7.   Wyndham develops, markets, and manages timeshare interests and provides consumer financing in Nevada within this Court's jurisdiction.

## JURISDICTION AND VENUE

8.   Jurisdiction is proper in Nevada because Defendant regularly conduct business in Nevada.

9.   Venue is proper in Clark County, Nevada because, at all times relevant hereto, Defendant operated a business in this jurisdiction, and events giving rise to Plaintiffs' claims occurred in Clark County.

10.   Wyndham's Purchase and Security Agreement ("PSA") contained an arbitration provision. The Plaintiffs submitted a claim to the American Arbitration Association ("AAA") pursuant to the arbitration clause on March 5, 2021. However, the AAA ruled on April 8, 2021 that Wyndham had failed to failed to comply with the AAA's policies regarding consumer claims, and therefore declined to administer the claim and any other claims between Wyndham and its consumers. Moreover, the AAA expressly ruled that either party may choose to submit its dispute to the appropriate court for resolution. *See* **Exhibit 1**, attached hereto. Accordingly, the Plaintiffs hereby file this Complaint against Defendant Wyndham by virtue of the AAA's instructions.

**BACKGROUND**

11.     The ten-billion-dollar timeshare industry has existed since 1969. Timeshares allow buyers to purchase fractional ownership interests in vacation properties worldwide.

12.     Timeshare developers often attract prospective customers by offering free gifts to attend a sales presentation including stays at resorts, tickets to events, and even cash. Many people who attend such sales presentations do so while they are on vacation and away from their usual support network (friends; relatives; legal counsel; etc).

13.     During such sales presentations, sales agents typically make oral commitments about the economic value of the proposed timeshares, the benefits that come with the proposed timeshares, and the ease of use of the proposed timeshares, that are not reflected in the written contracts or in reality.

14.     Many of these promises regarding the value and utility of timesharing are fabricated by sales agents to induce prospective owners who may be nervous about making such a major commitment with only a short period of time in which to make the decision.

15.     Timeshare sales agents help to relieve such prospective owners' anxiety by assuring them that timeshares are investments like traditional real estate. By equating timeshares to real estate, sales agents convince prospective owners that the timeshare's value will increase over time. Prospective buyers are led to believe that if they no longer want their timeshare, someone else will buy it on the open market.

16.     Traditionally, timeshares were sold as actual deeded weeks at specific geographic resort locations. Owners could stay in that location during the same week each year. Today, most timeshares, such as the Sabellas', are more often sold as "points." These points can then be used to pay for stays at Wyndham resorts.

17.     After agreeing to purchase the timeshare, owners then sign *lifetime* contracts, with most associated mortgages carrying interest rates exceeding ten or even fifteen percent APR. These contracts also obligate the owner to pay annual maintenance fees, property taxes, and assessments for upkeep of the developer's properties, *for life*.

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE A
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

18.     Owners who do decide to purchase timeshares are then given a raft of contractual information to review and sign. Such signings generally occur toward the end of a multiple-hours-long sales presentation. Owners are expected to review detailed and complex legal language and make a binding lifelong commitment, all in a matter of minutes or hours.

19.     Owners often later discover that many of the promises made to them during the sales presentation were fabrications. Availability is not what it was promised; customer service is subpar; resorts are nowhere near as nice as those shown during the sales presentation; fees are higher than what they were led to believe. Most of these fabrications are not discoverable until well after the contractual rescission period has expired.

20.     The secondary market is flooded with timeshare owners who are desperate to rid themselves of their timeshares and the recurring fees that go with them. Thousands of these timeshares are posted online for a fraction of their purchase price. Many of the same timeshares that are sold for tens of thousands of dollars by timeshare developers are readily available on eBay for as little as one dollar. Many of those timeshares listed for one dollar also include some form of payment from the current owner to the prospective purchaser. Such timeshares therefore have negative value.

## OVERVIEW

21.     The Sabellas purchased a points-based timeshare membership in April 2018 while on vacation in Las Vegas, Nevada.

22.     During the April 2018 presentation, the Sabellas repeatedly stated that they were uninterested in timeshare ownership. To get around the Sabellas' objections, sales agents made several claims regarding the value and utility of timeshare ownership. These claims were later discovered to be false.

23.     Instead of signing paper documents at the 2018 sales presentation, the Sabellas signed their documents electronically. After the presentation, the Sabellas were given an electronic tablet and told that they could review their documents using that device. However, upon returning to their hotel room after the sales presentation, the device was discovered to be defective.

24. Within twenty-four hours of their purchase, the Sabellas had changed their mind and telephoned Wyndham directly to exercise their rescission rights. The Sabellas also tried to telephone the specific sales agents Vince Doe, Jeffrey Gonsalvez and Andre Lavigne to rescind their purchase, with no success.

25. By the time their calls were returned, the Sabellas' contractual rescission period had expired. However, because of the defective tablet, the Sabellas had never been made reasonably aware of such rescission rights or the deadline by which to assert them.

26. The Sabellas are now locked into a lifelong contractual commitment for a service they never wanted, have never used and will never use, and that cannot be reasonably transferred to another owner except at prohibitive cost.

## FACTS

27. Judy Sabella is sixty-three years old.

28. Timothy Sabella is sixty-three years old.

29. At all material times during their interactions with Wyndham, the Sabellas were "elderly persons" as defined by NRS § 598.0933.[2]

30. On April 20, 2018, the Sabellas attended a sales presentation at the Wyndham Grand Desert Resort in Las Vegas, Nevada.

31. Wyndham was responsible for training, deploying, and supervising the sales agents involved in this presentation.

32. Wyndham agents Vince Doe, Jeffrey Gonsalvez, and Andre Lavigne conducted the sales presentation.

33. The Sabellas attended the presentation solely because of the promise of a free dinner and event tickets. During the presentation, the Sabellas repeatedly told sales agents they had no interest in purchasing a timeshare. Yet, sales agents persisted.

34. Throughout the sales presentation, the Sabellas were promised that the proposed timeshare:

---

[2]"Elderly person" means a person who is 60 years of age or older. NRS § 598.0933.

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106
LAS VEGAS, NEVADA 89106

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

  a)  was economically valuable;

  b)  would appreciate in value;

  c)  would be something of great economic value they could leave to their heirs;

  d)  would cost at least two to three times as much at any time in the future; and

  e)  various other misrepresentations.

35. Wyndham agents also failed to disclose material information with respect to the resale value, booking availability, and/or the liabilities associated with the timeshare interest.

36. In reliance on the above misrepresentations and omissions of material fact, the Sabellas finally and reluctantly agreed to purchase a total of 154,000 Wyndham points, for a purchase price of $23,000.00.

37. The Sabellas were given an "Electronic Delivery Acknowledgment" document authorizing Wyndham to provide copies of required disclosures electronically. Wyndham then provided the Sabellas with a tablet that was supposed to contain electronic copies of the required disclosures.

38. The tablet was broken and did not, in fact, contain any documents at all. The Sabellas did not receive the required disclosures until September 1, 2018, well after the rescission period had expired.

39. The Sabellas would not have agreed to the Contract but for the Defendant's misrepresentations, above.

40. The Sabellas financed $19,846.65 of the purchase price via a Wyndham-backed mortgage, at a 14.99 Annual Percentage Rate. Therefore, the total cost of the timeshare, including down payment and financing, was $42,157.95.

41. Contract Number 00123-1807991 is attached hereto as **Exhibit 2**.

42. The Sabellas believed the representations described above.

43. It was reasonable for the Sabellas to believe these representations considering that the agents conducting the sales presentation were real estate licensees with statutory duties of good faith and honesty owed to the them.

44.     Further, the Sabellas had no reason not to trust the Defendant, whose training and experience purportedly made them timeshare experts.

45.     When the Sabellas returned to their hotel room after the April 20, 2018 presentation, they found that the electronic tablet they had been given, purportedly containing their contractual documents and other relevant membership information, did not work. While the Sabellas would have preferred to immediately review the documents, they decided that since the tablet did not work in the hotel, they would try again when they returned home from their vacation.

46.     Within a week of returning home to Pennsylvania from their Las Vegas vacation, the Sabellas asked their daughter, Angela Jenny, to assist with the defective tablet. Ms. Jenny, who has more experience with electronics than do either Judy or Timothy Sabella, told the Sabellas that the tablet was not working, and that it had nothing to do with the wi-fi.

47.     After several calls to the tablet manufacturer's tech support, it was ultimately discovered that there were no documents whatsoever stored on the tablet.

48.     After realizing there were no contractual documents for their review stored on the tablet, the Sabellas started calling Wyndham as well as every one of the sales representatives who had been present in the sales presentation. The Sabellas did not receive a call back until May 9, 2018, when Vince Doe finally returned their call.

49.     During that May 9, 2018 call back, Vince Doe told the Sabellas he would contact Wyndham about the defective tablet, and that he would reach out to them within one week.

50.     Vince Doe did not return the Sabellas' calls within the promised week, so the Sabellas called Michael Nunes, a representative from the Wyndham Grand Desert Resort. Mr. Nunes gave the Sabellas a report number (110046818) and contact information for Jennifer Mason, an agent who handled internal complaints and resolutions for Wyndham.

51.     Ms. Mason then opened an internal investigation into the Sabellas' claims regarding the defective tablet. The Sabellas were then told that they would be unable to rescind their contract despite the fact they had been trying to do so since the day after the sales presentation. Wyndham did not provide any information obtained in this purported investigation to support its conclusion.

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106
LAS VEGAS, NEVADA 89106

52.     Frustrated with the continued unwillingness by Wyndham to acknowledge their reasonable rescission request, the Sabellas engaged counsel.

53.     Counsel for the Sabellas sent multiple demand and settlement letters but Wyndham refused to respond to the substance of the Sabellas' position.

54.     To date, the Sabellas have expended approximately $13,164 toward the mortgage and $2,700 in maintenance fees. The Sabellas have never used their timeshare.

55.     The Sabellas have since learned that the timeshare they purchased had no economic value when they purchased it and has not substantially increased in price or value since their purchase.

**FIRST CAUSE OF ACTION**
**FINANCIAL ELDER ABUSE – NRS § 41.1395**

56.     The Sabellas restate and incorporate herein the above paragraphs.

*57.*     [I]f an older person or a vulnerable person suffers a personal injury or death that is caused by abuse or neglect or suffers a loss of money or property caused by exploitation, the person who caused the injury, death or loss is liable to the older person or vulnerable person for two times the actual damages incurred by the older person or vulnerable person. *NRS § 41.1395(1).*

*58.*     If it is established by a preponderance of the evidence that a person who is liable for damages pursuant to this section acted with recklessness, oppression, fraud or malice, the court shall order the person to pay the attorney's fees and costs of the person who initiated the lawsuit. *NRS § 41.1395(2).*

59.     "Exploitation" means any act taken by a person who has the trust and confidence of an older person or a vulnerable person… to: (1) Obtain control, through deception, intimidation or undue influence, over the money, assets or property of the older person or vulnerable person with the intention of permanently depriving the older person or vulnerable person of the ownership, use, benefit or possession of that person's money, assets or property; or (2) Convert money, assets or property of the older person with the intention of permanently depriving the older person or

- 8 -

vulnerable person of the ownership, use, benefit or possession of that person's money, assets or property. *NRS § 41.1395(4)(b)*.

60.     The Sabellas, who at all material times were elderly as defined by Nevada law, suffered the loss of $23,864.00 as a result of exploitation by Wyndham, as discussed herein.

61.     The real estate licensees, who defrauded the Sabellas, and who were employees of Defendant, were governed by duties to the Sabellas that established, by default, a relationship of trust and confidence between those licensees and the Sabellas.

62.     Nevada law provides that a real estate licensee shall not deal with any party to a real estate transaction in a manner which is deceitful, fraudulent or dishonest. *NRS § 645.3205*.

63.     Because Defendant's sales agents were subject to the above duties as real estate licensees, the Sabellas had the right to have trust and confidence in the sales agents for Defendant.

64.     Therefore, the Sabellas reasonably held trust and confidence in the sales agents for Defendant.

65.     Defendant obtained control of the Sabellas' money through deception, unnecessary delay, and fraud, with the intention of permanently depriving them of their money.

66.     Defendant converted the Sabellas' money with the intention of permanently depriving the Sabellas of their money when they refused to honor their reasonable rescission request.

67.     Defendant's fraud was reckless, oppressive, fraudulent, and malicious.

68.     The Sabellas have suffered damages in an amount to be determined at trial.

## SECOND CAUSE OF ACTION
## NEVADA DECEPTIVE TRADE PRACTICES ACT VIOLATIONS – NRS § 598.0977

69.     The Sabellas restate and incorporate herein the above paragraphs.

70.     The Sabellas are victims of "consumer fraud," "and deceptive trade practices" thereby entitling them to bring an action pursuant to NRS 41.600 and NRS 119A.710.

71.     In Nevada, a person engages in a "deceptive trade practice" if, in the course of his or her business or occupation, he or she:

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

LAS VEGAS, NEVADA 89106

...5. Knowingly makes a false representation as to the characteristics, ingredients, uses, benefits, alterations or quantities of goods or services for sale...

7. Represents that goods or services for sale or lease are of a particular standard, quality or grade, or that such goods are of a particular style or model, if he or she knows or should know that they are of another standard, quality, grade, style or model...

9. Advertises goods or services with intent not to sell or lease them as advertised...

13. Makes false or misleading statements of fact concerning the price of goods or services for sale or lease, or the reasons for, existence of or amounts of price reductions...

15. Knowingly makes any other false representation in a transaction.

16. Knowingly falsifies an application for credit relating to a retail installment transaction, as defined in *NRS 97.115*.

NRS § 598.0915.

72.     If an elderly person or a person with a disability suffers damage or injury as a result of a deceptive trade practice, he or she or his or her legal representative, if any, may commence a civil action against any person who engaged in the practice to recover the actual damages suffered by the elderly person or person with a disability, punitive damages, if appropriate, and reasonable attorney's fees... *NRS § 598.0977*.

*73.*     "Elderly person" means a person who is 60 years of age or older. *NRS § 598.0933.*

74.     Judy Sabella was born on October 20, 1957. She is currently sixty-three years old. At all times relevant to this lawsuit, she was an "elderly person" as defined by the Nevada Revised Statutes.

75.     Timothy Sabella was born on November 9, 1957. He is currently sixty-three years old. At all times relevant to this lawsuit, he was an "elderly person" as defined by the Nevada Revised Statutes.

76.     Except as otherwise provided in NRS 40.4639, 125B.050 and 217.007, actions other than those for the recovery of real property, unless further limited by specific statute, may only be commenced as follows...Within 4 years: ... (d) An action against a person alleged to have committed a deceptive trade practice in violation of NRS 598.0903 to 598.0999, inclusive, but the cause of action shall be deemed to accrue when the aggrieved party discovers, or by the exercise

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

of due diligence should have discovered, the facts constituting the deceptive trade practice. *NRS §*
*11.190.*

77.     As described above, and otherwise, Wyndham has violated various deceptive trade
practices provisions repeatedly throughout their defrauding of the Sabellas by engaging in
misrepresentations and omissions of material fact.

78.     In addition, Wyndham's agents engaged in violations of NRS 598.0918 by
conducting the sales presentation or solicitation in a manner that is considered by a reasonable
person to be annoying, abusive or harassing.

79.     The Sabellas have been damaged financially, and otherwise, as a result.

80.     The Sabellas have suffered damages in an amount to be determined at trial.

## THIRD CAUSE OF ACTION
## NEVADA TIMESHARE REGULATION VIOLATIONS - NRS 119A

81.     The Sabellas restate and incorporate herein the above paragraphs.

82.     It is unlawful for any person to use false or misleading information to advertise the
sale of time shares. *NRS § 119A.700.*

83.     It is unlawful to engage in unfair methods of competition or deceptive or unfair acts
in the offer to sell or sale of a time share including:

> "1. Misrepresenting or failing to disclose any material fact
> concerning a time share...
> 3. Receiving from a prospective purchaser any money or other
> valuable consideration before the purchaser has received a
> statement of public offering...
> 4. Knowingly making false representations and failing to disclose
> material facts as to the characteristics, uses, and/or benefits of the
> goods and/or services relating to the Timeshare interest...
> 7. Misrepresenting the nature or extent of any services incident to
> the unit...
> 12. Any act or practice considered an unfair method of competition
> or an unfair or deceptive act or practice under NRS 207.170,
> 207.171 or 598.0915 to 598.0925, inclusive, or chapter 598A or
> 599A of NRS,

*NRS § 119A.710.*

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106
LAS VEGAS, NEVADA 89106

84.     As described above, and otherwise, Defendant have violated various provisions of NRS Chapter 119A repeatedly through their defrauding of the Sabellas.

85.     Wyndham also violated NRS 119A.400 by failing to provide a copy of the public offering statement, bylaws, and Wyndham's governing documents before, during, and after the execution of the purchase agreements.

86.     In addition, since Wyndham intended to provide a copy of the purchase documents (including the public offering statement) electronically, Wyndham engaged in violations of NRS 119A.400 by failing to provide notice to the Sabellas of their right of cancellation pursuant to NRS 119A.410 in a single separate document.

87.     Wyndham also interfered with the Sabellas' recission rights under NRS 119A.410 rendering the timeshare purchase agreements voidable.

88.     Pursuant to NRS 119A.475, Plaintiffs are entitled to bring a private cause of action and recover damages in the amount of the difference paid for the timeshare and the value of the timeshare at the time the suit is brought or rescission of the contract of sale and refund of any consideration paid by the purchaser and reasonable attorneys' fees for bringing this action.

89.     The Sabellas have suffered damages in an amount to be determined at trial.

**FOURTH CAUSE OF ACTION
BREACH OF FIDUCIARY DUTY**

90.     The Sabellas restate and incorporate herein the above paragraphs.

91.     In Nevada, timeshare salespeople must be licensed.

92.     Wyndham is a real estate licensee in the State of Nevada.

93.     Wyndham's Nevada real estate license number is 504840.

94.     In Nevada, a real estate licensee shall not deal with any party to a real estate transaction in a manner which is deceitful, fraudulent or dishonest. *NRS § 645.3205.*

95.     A licensee who acts as an agent in a real estate transaction: 1. Shall disclose to each party to the real estate transaction as soon as is practicable: (a) Any material and relevant facts, data or information which the licensee knows, or which by the exercise of reasonable care and diligence should have known, relating to the property which is the subject of the transaction... 2.

- 12 -

1    Shall exercise reasonable skill and care with respect to all parties to the real estate transaction.

2    *NRS § 645.252.*

3        96.    In Nevada, any real estate licensee acting for two or more parties to a transaction is

4    required to provide each affected client with a state-mandated disclosure form called the "Consent

5    to Act" form. *NRS § 645.252 (1)(d).* The Sabellas were never given a copy of this required form.

6        97.    As described above, Defendant and their agents violated their Nevada real estate

7    licensee duties in their interactions with, and to the detriment of, the Sabellas. Because of their

8    status as licensed real estate professionals, Defendant had a fiduciary relationship with the

9    Sabellas.

10       98.    Defendant's failure to disclose required documents and relevant information

11   constitutes a breach of their fiduciary duties.

12       99.    As a result of these breaches, the Sabellas have suffered damages in an amount to

13   be determined at trial.

14                              **FIFTH CAUSE OF ACTION:**
15                                        **FRAUD**

16       100.   The Sabellas restate and incorporate herein the above paragraphs.

17       101.   Defendant made repeated misstatements of material fact, including, but not limited

18   to statements that Wyndham timeshares proposed for sale to the Sabellas:

19       a)     were economically valuable;

20       b)     would appreciate in value;

21       c)     would be something of great economic value they could leave to their heirs;

22       d)     would be easy to resell to third parties for a high price;

23       e)     would cost double or triple the instant price per point if not purchased in the instant

     presentation; and
24
         f)     various other misrepresentations as alleged herein and otherwise.
25
         102.   At the time these statements were made, the sales agents knew they were false.
26
         103.   The sales agents made these statements to persuade the Sabellas to enter into the
27
     contract described above.
28

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

104.    In reasonable reliance on these statements the Sabellas agreed to the contract described above.

105.    The Sabellas have suffered damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs respectfully request that this Court enter an Order:

A.    Rescinding all Contracts and all other agreements between Wyndham and the Sabellas;

B.    Ordering the return of all funds paid by the Sabellas to Wyndham with interest of no less than 10% per year from the date of Wyndham's wrongful conduct.

C.    Awarding the Sabellas two times their actual damages pursuant to NRS § 41.1395.

D.    Awarding the Sabellas punitive damages pursuant to NRS § 598.0977.

E.    Awarding the Sabellas statutory penalties, punitive damages, reasonable attorney fees, and costs; and

F.    Ordering such other relief as the Court may deem necessary and just.

DATED this **14**<sup>th</sup> day of April, 2021.

ALBRIGHT, STODDARD, WARNICK & ALBRIGHT

G. MARK ALBRIGHT, ESQ. (001394)
JORGE L. ALVAREZ, ESQ. (014466)
801 S. Rancho Drive, Suite D-4
Las Vegas, Nevada 89106
Tel:  (702) 384-7111
Fax: (702) 384-0605
gma@albrightstoddard.com
jalvarez@albrightstoddard.com

and

Jonathan A. White
Washington Bar No. 45442
**GRANITE SPIRE LAW GROUP, PLLC**
2003 Western Ave. Ste. 345
Seattle, WA 98121
T: (206) 494-3224 / F: (206) 770-7507

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106
LAS VEGAS, NEVADA 89106

1   jwhite@granitespirelaw.com

2   *Attorneys for Plaintiffs*

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT 1



1101 Laurel Oak Road
Voorhees, NJ 08043

April 8, 2021

Jorge L. Alvarez, Esq.
Albright, Stoddard, Warnick & Albright
801 South Rancho Drive
Suite D-4
Las Vegas, NV 89106
Via Email to: jalvarez@albrightstoddard.com

Wyndham Vacation Resorts, Inc.
6277 Sea Harbor Drive
Orlando, FL 32821
Via Mail & Email to: wyndhamcaresteam@wyn.com

Case Number: 01-21-0002-1783

Judy and Timothy Sabella
-vs-
Wyndham Vacation Resorts, Inc.

Dear Parties:

Claimant has filed with us a demand for arbitration. We note that the arbitration clause provides for arbitration by
the American Arbitration Association ("AAA").

Prior to the filing of this arbitration, Wyndham Vacation Resorts, Inc. failed to comply with the AAA's policies
regarding consumer claims.  Accordingly, we must decline to administer this claim and any other claims between
Wyndham Vacation Resorts, Inc. and its consumers at this time. These policies can be found on our web site,
www.adr.org, in the Consumer Due Process Protocol ("Protocol") and the Consumer Arbitration Rules
("Consumer Rules"), including the Costs of Arbitration.

Accordingly, we have administratively closed our file and will refund any payment received by the filing party.
According to R-1(d) of the Consumer Rules, should the AAA decline to administer an arbitration, either party
may choose to submit its dispute to the appropriate court for resolution.

If you believe we have declined this matter in error, please email ConsumerFiling@adr.org.

Pursuant to the AAA's current policy, in the normal course of our administration, the AAA may maintain certain
electronic case documents in our electronic records system.  Such electronic documents may not constitute a
complete case file.  Other than certain types of electronic case documents that the AAA maintains indefinitely,
electronic case documents will be destroyed 3 months after the date of this letter.

If Wyndham Vacation Resorts, Inc. advises the AAA in the future of its intention to comply with the AAA's
Consumer Arbitration Rules and if applicable, resolves any outstanding payment obligations, the AAA may
consider at its sole discretion, accepting newly filed consumer cases going forward.  Therefore, if Wyndham
Vacation Resorts, Inc. wishes for the AAA to consider accepting consumer disputes going forward, Wyndham
Vacation Resorts, Inc. must, at a minimum, register its clause on the Consumer Clause Registry on our website,
www.adr.org/clauseregistry. Upon completion of the registration process and confirmation from the AAA that
Wyndham Vacation Resorts, Inc. is now active on the Consumer Clause Registry, Wyndham Vacation Resorts,

Inc. is responsible for informing all parties that Claimant may re-file their claim.

Sincerely,

Consumer Filing Team
ConsumerFiling@adr.org
Fax: (877) 304-8457

cc:     Andrea Brebbia

EXHIBIT 2

*[handwritten]: We never received a copy of this or any of the contract documents when they emailed them by us on Sept 12 2018*

IIIIIIII2222222222222

This is a binding Contract by which you agree to purchase an interest in a time-share project. You should examine the statement of your right to revoke this Contract within 5 calendar days, which is contained elsewhere in this Contract.

## SECURITY AGREEMENT

| | |
|---|---|
| Member Number | **00203461007** |
| Contract Number | **00123-1807991** |
| Contract Date | **04-20-2018** |

CLUBWYNDHAM® ACCESS VACATION OWNERSHIP PLAN
RETAIL INSTALLMENT CONTRACT
PURCHASE AND SECURITY AGREEMENT
(Nevada)

Wyndham Vacation Resorts, Inc., a Delaware corporation (*"Seller"*), whose address is **6277 Sea Harbor Dr., Orlando, FL 32821** agrees to sell to TIMOTHY ERIC SABELLA and JUDY A SABELLA JOINT TENANTS WITH THE RIGHT OF SURVIVORSHIP (*"Owner"*) a membership interest (*"Ownership"*) in PTVO Owners Association, Inc., a non-stock, non-profit Delaware corporation (*"Association"*), which Ownership includes the right to participate in the ClubWyndham Access Vacation Ownership Plan (*"Club"*) and the right to use and occupy Club Accommodations. If more than one person executes this Agreement as Owner, the liability of each Owner under this Agreement shall be joint and several. Seller and Owner may hereinafter be referred to collectively as the *"Parties"* or individually as a *"Party"*. These rights are denominated in Points and Owner agrees to purchase the Ownership for a purchase price of **$23,000.00** (the *"Purchase Price"*) on the following terms and conditions:

Points consisting of the following:

Perpetual Points:    **154,000**    Annual  X   Biennial ___

*"Initial Use Year"*: **October 1st** through **September 30th.**

### A. BENEFITS AND NATURE OF OWNERSHIP

**1. Ownership.** Owner is a member of the Association, and is entitled: (a) to use Points to reserve the use of accommodations in the Club (*"Club Accommodations"*), (b) to vote for directors of the Association, (c) to vote on major decisions of the Association, and (d) through the Club and the Association, to participate in the ownership of the assets of the Association. At the Closing of the purchase of the Ownership as set forth in Section 38 below, (i) Owner will receive an Ownership Certificate evidencing the Ownership (which will delineate, among other things, Owner's Points), and (ii) Owner's name and the other information concerning the Ownership will be entered into the permanent records of the Association (*"Club Ownership Register"*). Owner is purchasing a timeshare use timeshare interest in a multi-site timeshare plan called ClubWyndham Access Vacation Ownership Plan. The address of this timeshare plan is **6277 Sea Harbor Dr., Orlando, FL 32821.** Refer to the ClubWyndham Access Public Offering Statement (*"Public Offering Statement"*) accompanying this Agreement for a list of Club Accommodations which are under construction (if any) and estimated completion dates.

**2. Duration of Ownership.** Ownership shall be effective from the date on which the Closing described in Section 38 below occurs and Owner may use Points to obtain reservations and other Club benefits starting with Owner's Initial Use Year as set forth above. Ownership shall be perpetual.

**3. Transferability of Ownership.** Subject to the terms and provisions of the Declaration of Covenants, Conditions and Restrictions and Grant and Reservation of Easements for ClubWyndham Access Vacation Ownership Plan (*"Declaration"*), the Ownership (and the Points) may be transferred entirely or partially at any time during their term and without limitation to the number of transfers, through sale, gift, inheritance, dissolution of marriage, or by any operation of law, subject to the following terms: (a) a reasonable Ownership transfer fee has been paid to the Association; (b) all payments or charges due the Association, Seller or any Holder or Co-Holder (as those terms are defined in Section 16) of this Agreement are current; (c) the Points transferred and the Points retained, if any, must each be enough Points to satisfy the then Minimum Points Requirement as established by Seller; (d) the Association must consent to the transfer which consent shall not be unreasonably withheld, conditioned or delayed; (e) the transfer must be entered in the Club Ownership Register; (f) all aspects of the transfer must comply with applicable law; and (g) if any financed amounts are still owing to Seller or to any Holder or Co-Holder, (i) the Owner must obtain the written consent of the Seller or any Holder or Co-Holder to such proposed transfer which consent shall not be unreasonably withheld, conditioned or delayed, (ii) the transferee must satisfy the then current credit requirements of the Seller or any Holder or Co-Holder, and (iii) transferee may be charged a reasonable financing transfer fee. Owner and Seller each acknowledge and agree that Seller has entered into this Agreement in consideration of and reliance upon the creditworthiness and reliability of Owner.

### B.   ACCOMMODATIONS AND OTHER MATTERS

**4. Club Accommodations.**  Owner shall have access to all existing and future Club Accommodations and the properties within which those Club Accommodations are located (*"Club Properties"*), as well as all other accommodations owned or operated by or associated with Club, wherever located.  Provided however the location and specific nature of the Club Accommodations shall be subject to change in accordance with the Club Instruments (as defined below.)

**5. Participation of Owner in Association Governance.**  The Articles of Incorporation, By-laws, and Regulations of the Association and the Declaration provide, among other things, for: (a) meetings of, and votes by the Parties who hold Ownership in the Association (called *"Owners"*); (b) election of directors; and (c) use rights in Club Accommodations.

**6. Control of Club Accommodations by the Association.**  The Association or one or more Trusts each of whose beneficiary is the Association, shall hold the deed or the lease to each Club Accommodation, free of the effects of debt encumbrances (or with a non-disturbance agreement in place), and subject to the Declaration which, among other things: (a) is recorded or filed against each Club Accommodation; (b) provides for dedication of the Club Accommodation to the Club; and (c) establishes the Points as the currency of use in the Club.  Notwithstanding the Association's or a Trust's ownership of Club Accommodations in the various Club Properties, in many instances, not all of the accommodations at a Club Property will be or become Club Accommodations and therefore, the Association will have limited, if any, right to control that Club Property.

**7. Power of Attorney.**  The power to direct the Trustee as to all matters shall be exercised solely by the Association and by the Seller acting in accordance with the Club Instruments.  The Association and the Seller may exercise that power of direction without the consent of the Owner.  To the extent that the joinder of the Owner may be required to validate any act or thing done by the Association or the Seller pursuant to this power of direction, each Owner, by entry in the Club Ownership Register, grants to the Association and to the Seller a special power of attorney for these purposes, coupled with an interest that cannot be revoked as set forth in Section 7.5 of the Declaration.

**8. The Club.**  The Club is governed by, among other things, the Declaration; the Articles of Incorporation and By-laws for the Association; Trust Agreements, if any; and the regulations, as each may be lawfully amended or supplemented from time to time (all such governing documents, as so amended, *"Club Instruments"*).  In addition, because many Club Accommodations may be located within Club Properties that are themselves operated as condominiums or timeshare programs, those Club Accommodations are subject to declarations, articles of incorporation and by-laws for the association managing such property and the rules and regulations of the condominium and/or timeshare programs being operated thereon (*"Club Property Instruments"*).  The Club Instruments, together with the Club Property Instruments, will govern many aspects of ownership, use and operation of the Club and the Club Accommodations, including, without limitation, (a) reservations; (b) the number of persons permitted to occupy each Club Accommodation; (c) guest policies; (d) fees; (e) rental of Club Accommodations by Owners and by the Club and others; (f) charges for use of specific facilities at each Club Property; (g) personal conduct and behavior; (h) check-in and check-out times; and (i) care and maintenance of Club Accommodations and related facilities and amenities.  The Ownership conveyed by this Agreement shall be held by Owner subject to each of the provisions of the Club Instruments and the Club Property Instruments.

**9. Development and Management of Club.**  Seller has developed the Club and has caused accommodations in Club Properties to be transferred to the Association or a Trust for the benefit of the Association in exchange for the proceeds of sale as well as exclusive marketing rights, and the right to add additional properties.  Pursuant to a Management Agreement between Seller and/or one or more affiliates of Seller, and the Association, Seller or such affiliate will also manage the Club, the Association and those Club Properties which are not part of other timeshare or condominium programs.

### C.   POINTS USE

**10. Club Program.**  The benefits and obligations of Ownership are determined by the number and types of Points assigned to the Ownership.

(a) Use.  Points may be used to reserve Club Accommodations that are available through the Club on a space available basis.  The number of Points required for occupancy of any Club Accommodation will be based on numerous factors, including, without limitation, the season, location, unit size and type, and day of the week.

(b) Issuance.  Points are renewed annually (or, in the case of Biennial Points, every other year) throughout the term of the Ownership, at the beginning of Owner's Use Year, in the total number of Points purchased by Owner.

(c) Additional Points.  Owner may purchase additional Points from the Seller at any time after the date of this Agreement, subject to the following: (i) the Points are available; (ii) Owner is not in default under this Agreement; (iii) the Owner is in good standing with the Association; (iv) the then current price is paid; and (v) if Seller finances the purchase, Owner satisfies Seller's then current credit requirements.

### D.   QUALIFICATIONS AND CONDITIONS TO PURCHASE ASSOCIATION MEMBERSHIP

**11. Legal Capacity.**  Owner represents that Owner is a person or entity with the legal capacity to enter into this Agreement.

**12. Non-Investment Purchase.**  Owner represents that Owner is purchasing an Ownership for the purpose of recreational and social use, and not for financial profit.

IIIIIII2222222222222

Contract Number **00123-1807991**

E. CONTRACTUAL STANDARDS

**13. Liability Limitations.** Owner agrees that Owner and Owner's family or guests assume all risks of loss or damage to persons or property in using the Club Accommodations and the Club Properties in which they are located, except that this limitation of liability shall not apply in cases of negligence of the Seller, Manager or Association. Owner also agrees to maintain liability and property damage insurance in connection with any motor vehicle(s) brought to the Club Accommodations, in amounts customarily carried on such vehicle(s).

**14. Owner Default.** Owner shall be in default under this Agreement if Owner fails to pay on time, keep any promise, or fulfill any agreement or obligation contained herein or in any of the documents or instruments referenced herein. Without limiting the scope of the prior sentence, obligations include obtaining the written consent of Seller or any Holder or Co-Holder to transfer any part of the Ownership which is subject to outstanding amounts financed and owed to Seller or any Holder or Co-Holder. In the event of a default by Owner, Owner shall not be entitled to reserve, use, or occupy any Club Accommodation, or to exercise any other rights, benefits, or privileges appurtenant to Owner's Ownership.

(a)  Owner's default in the performance of any of Owner's obligations under this Agreement on or before Closing shall entitle Seller to terminate this Agreement immediately and all of Owner's rights, benefits, and privileges hereunder.  Upon such termination, Seller shall cause Escrow Agent to deliver to Seller, all sums of money previously paid by Owner hereunder as liquidated damages and not as a penalty as Seller's  exclusive remedy for Owner's default.  To the extent Owner has paid any assessments or other amounts to the Association prior to Closing, those amounts shall also be forfeited and retained by the Association.

(b)  If Owner fails to timely perform any of Owner's obligations under this Agreement or the Club Instruments after Closing, Owner shall be in default and Seller or any Holder or Co-Holder may enforce the Seller Security Interest (as described in Section 15 of this Agreement) against Owner's Ownership (and the proceeds thereof) in accordance with this Agreement.  Upon the occurrence of any such failure, Seller or any Holder or Co-Holder shall give Owner written notice thereof and if Owner has not cured the applicable failure within thirty (30) days after Seller or any Holder or Co-Holder gives such notice, Owner shall be in default under this Agreement and Seller or any Holder or Co-Holder may enforce the Seller Security Interest in accordance with Section 15 below.

**15. Remedies/Security Interest.**  To secure compliance with Owner's obligations hereunder, Owner hereby grants to Seller and any Holder or Co-Holder a security interest (*"Seller Security Interest"*) in the Ownership purchased under this Agreement and all proceeds therefrom (collectively the *"Collateral"*).  The Seller Security Interest constitutes a lien on the Collateral.  The Seller Security Interest and lien shall remain in effect as long as there are obligations of Owner in favor of Seller or any Holder or Co-Holder to be fulfilled under this Agreement.  No waiver by Seller, the Association, or any Holder or Co-Holder of this Agreement, of any default or breach by Owner shall operate as a waiver of the same or any other default or breach by Owner or any other Party listed as Owner in the future.  Each Owner signing below hereby appoints each other Owner signing below as his or her agent for dealing with Seller and any Holder or Co-Holder of this Agreement for any purpose.  Upon the occurrence of a default described in Section 14 above, Seller or any Holder or Co-Holder of this Agreement may choose one or more of the following remedies: (a) declare the entire unpaid balance of the Purchase Price and a Processing Fee immediately due and payable, unless prohibited by law; (b) foreclose the lien created by the Seller Security Interest and sell or retain the Ownership in satisfaction of Owner's obligations hereunder, or exercise any other right under Article 9 of the applicable Uniform Commercial Code; (c) terminate the Ownership and retain all amounts previously paid by Owner as compensation for damages incurred in proceeding pursuant to this Agreement (Seller and Owner agree that in such case it would be impractical or extremely difficult to fix the actual damage and therefore, the amounts previously paid by Owner are a fair and reasonable estimate of Seller's actual damages for such default); (d) suspend use rights, including, but not limited to, cancelling any existing and future reservations; (e) sue for the unpaid balance due hereunder; (f) deny request to transfer Owner's Ownership and Points in the Club Ownership Register; and/or (g) pursue any other remedy allowed by law, except Seller cannot terminate this Agreement or foreclose against the Ownership without the consent of the Holder or Co-Holder of any right to the unpaid balance due hereunder.

**16. Additional Creditor.**  The right to receive payment of the Purchase Price and Processing Fee under this Agreement belongs to Seller, but could be assigned, collaterally or absolutely, to another creditor (such creditor is referred to herein as a *"Holder"* or *"Co-Holder"*).  This Agreement, together with all security interests, rights of enforcement and payment due hereunder, is freely assignable by Seller, its successors and assigns.

**NOTICE:**

**ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR (OWNER) COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS HEREOF.  RECOVERY HEREUNDER BY THE DEBTOR (OWNER) SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR (OWNER) HEREUNDER.**

**17. General Provisions.**  Except as otherwise set forth under the "NOTICE TO BUYER'S" section of this Agreement, any written notice required or desired to be given hereunder shall be deemed given when personally delivered or after three (3) days deposit in the U.S. Mail, first class postage prepaid or one (1) day after acceptance by a nationally recognized overnight courier service, addressed to the address given herein or such subsequent address as is given by proper notice or when sent by facsimile to any facsimile number given by one Party to the other.  This Agreement, and any and all other documents executed at the same time as this Agreement, constitutes the entire agreement between the Parties hereto.  Except as otherwise provided herein, this Agreement shall be binding upon and benefit the heirs, executors, administrators and successors of each of the Parties.  If any provision of this Agreement shall be found to be invalid, the remaining provisions shall nevertheless remain in full force and effect.  Unless terminated in accordance with the terms of this Agreement, this Agreement shall survive the issuance of the Ownership and the Ownership Certificate and the registration thereof in the Club Ownership Register and shall survive the final payment toward the purchase hereunder.

|||||||2222222222222

Contract Number 00123-1807991

**18. Owner Responsibility.** Transfer or abandonment of the Ownership does not relieve Owner of Owner's obligations hereunder unless such transfer or abandonment of the Ownership is agreed to by the Association, the Seller and/or any Holder or Co-Holder of any right to the unpaid balance due under this Agreement.

**19. Communications with Owner.** Owner hereby expressly consents and agrees that the Association, Seller, and Seller's parent, subsidiaries, affiliates, successors, or assigns may use written, electronic or verbal means to contact Owner. This consent includes, but is not limited to, contact by manual calling methods, prerecorded or artificial voice messages, text messages, emails and/or automatic telephone dialing systems. Additionally, Owner hereby agrees that the Association, Seller, and Seller's parent, subsidiaries, affiliates, successors, or assigns may use any email address or any telephone number Owner provides, now or in the future, including a number for a cellular phone or other wireless device, regardless of whether Owner incurs charges as a result.

**20. Modifications and Changes.** Seller reserves the right to make changes in the Club Instruments for the purpose of correcting errors in the preparation and filing of all documents relating to the Club where necessary to establish the validity and enforceability of the Club Instruments. Seller reserves the right to add additional real property interests to the Club as provided in the Club Instruments. Seller further reserves the right to make clerical or typographical corrections in any documents related to this Agreement.

### F. ASSESSMENTS - ASSOCIATION'S SECURITY INTEREST

**21. Regular Assessments.** The current annual Regular Assessment for Owner's Ownership is **$887.04** (U.S. Funds), based on the formula and rate of annual Regular Assessments currently established by the Association pursuant to the Club Instruments. Regular Assessments may be increased annually subject to the Club Instruments. Regular Assessments shall be used for Club Costs, including maintenance and operation of Club Accommodations (including for reserves) and operation and management of the Club, all as more particularly described in the Club Instruments.

**22. Special Assessments and Taxes.** The Association may levy special assessments subject to the Club Instruments. The Owner is also responsible for any tax that might be assessed by a civil taxing authority on the purchase of Owner's Ownership or the use of any Club Accommodations.

**23. Individual Charges.** Owner must pay separately for extra benefits including, but not limited to, if available, food, storage, extra maid service, purchase of goods, use of equipment, furnishings or facilities not normally provided as part of the Club Accommodation or the Club Property in which it is located, and exchange program services if available.

**24. No Warranties.** SELLER MAKES NO EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY CONCERNING THE CLUB ACCOMMODATIONS OR CLUB PROPERTIES, INCLUDING ANY WARRANTIES, STATUTORY OR OTHERWISE, OF HABITABILITY, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, EXCEPT AS MAY BE REQUIRED BY LAW AS OF THE DATE HEREOF. ACCORDINGLY, ANY REPAIRS TO THE CLUB ACCOMMODATIONS OR CLUB PROPERTIES NOT COVERED BY RESERVES MAY RESULT IN A SPECIAL ASSESSMENT.

**25. Damage Charges.** Owner must pay, as an Individual Charge, any cost of repair or replacement for any damage caused by Owner, Owner's family or guests, or anyone else that Owner allows or permits to occupy a Club Accommodation during Owner's reserved use period.

**26. Association's Remedies/Security Interest.** To secure compliance with the Club Instruments, Owner hereby grants to the Association a Security Interest (the *"Association Security Interest"*) in Owner's Ownership and all proceeds thereof (i.e., the Collateral), which Association Security Interest is subject to and subordinate to the Seller Security Interest. The Association Security Interest shall remain in effect as long as Owner's Ownership remains in effect. Upon a breach by, or failure of, Owner to perform any of Owner's obligations under the Club Instruments, which breach or failure extends beyond any notice, cure and/or grace periods specifically provided for in the Club Instruments, the Association may, among other things (the Club Instruments describe all of the Association's rights and remedies for an Owner default thereunder): (a) foreclose the lien provided by the Association Security Interest, subject to any Seller Security Interest then in existence, and sell or retain Owner's Ownership in satisfaction of Owner's obligations to the Association or exercise any other right under Article 9 of the applicable Uniform Commercial Code; (b), if the Seller Security Interest no longer exists, terminate the Ownership; (c) suspend the Owner's rights to use the Points ascribed to Owner's Ownership and in certain instances, the Owner's rights to occupy a Club Accommodation for which the Owner had previously obtained a reservation; (d) sue the Owner personally for all amounts due to the Association; (e) deny request to transfer Owner's Ownership and Points in the Club Ownership Register; and/or (f) pursue any other right or remedy allowed by law, subject, however, to the Seller Security Interest (if still in effect) and subject to the terms and provisions of the Club Instruments.

### G. PURCHASE PRICE, FINANCE CHARGE, AND PAYMENTS

**27. Purchase Price.** Owner agrees to pay Seller the Purchase Price in U.S. Funds (less other Credits/Discounts) together with a Closing Fee, a document processing fee (*"Processing Fee"*) described in Section 29 below and the credit service charge (*"Finance Charge"*) as described in Section 30 Credit Terms. Payments shall be credited first on the interest then due, then on principal. Interest will begin to accrue on the date hereof. **This Installment Contract provides for an interest rate of FOURTEEN 99/100 (14.99%) per annum.** This amount is required to be included in the calculation of the Annual Percentage Rate and Finance Charge.

**28. Closing Fee.** Owner agrees to pay Seller a **$30.00** Closing Fee, which Seller will pay to First American Title Insurance Company.

‖‖‖‖‖2222222222222

Contract Number **00123-1807991**

**29. Processing Fee.** Owner understands and agrees to pay Seller a Processing Fee of $349.00 which is charged to all buyers whether paying in cash or buying on credit to cover various processing services related to the sale including administration and preparation of various documents related to the sale. These services are separate and distinct from the services that Seller performs as settlement agent. Together, the Purchase Price, Processing Fee, Closing Fee and Finance Charge constitute the *"Total Sale Price".*

**30. Credit Terms.** Disclosures Required By: Federal Truth In Lending Act, and State Law. Creditor: WYNDHAM VACATION RESORTS, INC., **6277 Sea Harbor Dr., Orlando, FL 32821.**

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate: | FINANCE CHARGE The dollar amount the credit will cost you: | Amount Financed The amount of credit provided to you or on your behalf: | Total of Payments The amount you will have paid after you have made all payments as scheduled: | Total Sale Price The total cost of your purchase on credit including your down payment of: $3,502.35: |
|---|---|---|---|---|
| 14.99 | $18,808.95 | $19,846.65 | $38,655.60 | $42,157.95 |

Your payment schedule will be:

| No. of payments: | Amount of Each Payment: | Payments are due monthly, on the same date each month |
|---|---|---|
| 120 | $322.13 | Beginning: 06-04-2018 |

Late Charge:  You will be charged a late charge of $10.00 or the maximum permitted by applicable law for each payment that is more than ten (10) days late.

Security Interest:  You are giving the Seller and the Association a security interest in the Ownership being purchased and all proceeds therefrom.

Prepayment:  If you prepay the balance due, there will be no penalty.

Variable Rate:  Did Owner Enroll in the Auto Pay Plan using Owner's checking or savings account (*"APP"*)?
___ Yes _X_ No. If "Yes" is checked, the following applies. By enrolling in the APP using Owner's checking or savings account, Owner's Annual Percentage Rate disclosed above reflects a reduction of one-half percent (1/2%) (the *"Reduction"*) over the Annual Percentage Rate that would otherwise apply. The Annual Percentage Rate disclosed above will automatically increase by the amount of the Reduction in the event any one of the following occurs: (a) Owner discontinues participation in the APP, (b) Owner's financial institution is unable or unwilling to participate, or (c) Seller or any Holder or Co-Holder discontinues Owner's participation for reasonable cause. Any increase in the Annual Percentage Rate will take the form of higher payment amounts. For example, if your loan were for $10,000.00 at 17.49% for 7 years and the rate increased to 17.99%, your regular payment would increase by approximately $5.00.

Contract Reference:  Owner should refer to this Agreement for information about nonpayment, default, the right to accelerate maturity of Owner's payment obligation, prepayment rebates and penalties, and other creditor remedies.

| ITEMIZATION OF AMOUNT FINANCED | | | | | |
|---|---|---|---|---|---|
| 1. Gross Purchase Price: | $ | 39,000.00 | 6. Closing Fee (Paid to Escrow Agent): | $ | 30.00 |
| 2. Discounts/Other Credits: | $ | 16,000.00 | 7. Total Cash Price: | $ | 23,409.00 |
| 3. Net Cash Price (Paid to Seller): | $ | 23,000.00 | 8. Payments/Trade In: | $ | 0.00 |
| 4. Processing Fee (Paid to Seller): | $ | 349.00 | 9. Down Payment: | $ | 3,532.35 |
| 5. State and Local Taxes: | $ | 0.00 | 10. Amount Financed:* | $ | 19,846.65 |
| | | | *If applicable, includes refinancing an existing loan plus any unpaid interest. | | |

**31. Change in Law.** If a law, which applies to this Agreement and which sets maximum finance charges, is finally interpreted so that the interest or other charges collected or to be collected in connection with this Agreement exceed the permitted limits, then: (i) any interest and/or other charges will automatically be reduced by the amount necessary to reduce the interest rate and/or charges to the permitted limit, retroactively effective as of the date of this Agreement, and as though this Agreement originally provided for the reduced interest rate, finance and/or other charge, as the case may be; and (ii) any sums already collected from Owner which exceeded permitted limits will be refunded to Owner. The Holder or Co-Holder may choose to make this refund by reducing the principal Owner owes under this Agreement or by making a direct payment to Owner. If a refund reduces principal, the reduction will be treated as a partial prepayment.

**32. Other Charges.** The Association, the Seller and any Holder or Co-Holder each have the right to collect charges per dishonored check or other form of payment up to the maximum amount permitted by applicable law. For any late or missed payments, in addition to any applicable late charges, and to the extent permitted by law, Owner may also be charged a service or administrative fee to compensate for the added expense, administrative burden, and inconvenience caused by the delay in such payment. Additionally, to the extent permitted by law, Owner may also be charged any costs and expenses incurred in the attempted collection of any delinquent payments, including, without limitation, reasonable collection fees, which may be based on a percentage amount over and above the delinquent payments.

IIIIIII2222222222222

Contract Number **00123-1807991**

### H. MISCELLANEOUS PROVISIONS

**PLEASE READ THIS PROVISION OF THE AGREEMENT CAREFULLY. IT PROVIDES THAT CERTAIN DISPUTES MUST BE RESOLVED BY BINDING ARBITRATION. IN ARBITRATION YOU GIVE UP THE RIGHT TO GO TO COURT, INCLUDING THE RIGHT TO A JURY AND THE RIGHT TO PARTICIPATE IN A CLASS ACTION OR SIMILAR PROCEEDING. IN ARBITRATION, A DISPUTE IS RESOLVED BY AN ARBITRATOR INSTEAD OF A JUDGE OR JURY.    ARBITRATION PROCEDURES ARE SIMPLER AND MORE LIMITED THAN COURT PROCEDURES, AND ARE SUBJECT TO VERY LIMITED REVIEW.**

**33. Dispute Resolution/Arbitration.** Any Disputes between the Parties shall be resolved as follows:

a. **Definition of Disputes.** The Parties agree that any dispute, claim, suit, demand or controversy arising out of or relating to this Agreement (any "Dispute") shall be determined exclusively and finally by individual arbitration, except as specified below. "Dispute" includes, without limitation, any claim regarding any breach, termination, enforcement, interpretation or validity of this Agreement, any claim arising out of or related to the marketing, purchase, and/or use of Owner's Ownership, Owner's use of Seller's properties, and/or Owner's participation in any activities/events sponsored, organized, or made available by Seller or its affiliates.

b. **Neutral Arbitrator/No Jury.** Any Dispute will be submitted to a neutral arbitrator, for a final and binding determination, known as an award. The arbitrator is an independent decision maker, appointed by the AAA, who reviews and weighs evidence provided by both Parties, and issues an award enforceable in court.  Decisions by an arbitrator are subject to very limited review by a court. Except as expressly provided below in this Dispute Resolution/Arbitration clause, the Parties waive and relinquish any and all rights to have a court or a jury resolve any Dispute. **The Parties expressly waive any right to a jury trial.**

c. **Individual Basis/No Class Actions.** The Parties expressly intend that any Disputes will be arbitrated on an individual basis. There will be no right or authority for any Dispute to be arbitrated or litigated in any way on a class, mass, or other collective basis, and the Parties waive any right to bring or join any representative or other claim brought on behalf of the general public, other Owners, or other persons similarly situated.

d. **Certain Carve-Outs.** Despite this arbitration provision, the Parties reserve certain rights to proceed in court without waiving their right to arbitrate under this Dispute Resolution/Arbitration provision: (1) Seller reserves the right to seek emergency injunctive relief from a court to address any circumstances or behavior, by Owner or any person who obtained or is using Owner's rights and privileges, that Seller believes may present a risk or threat to the safety, security or reputation of any resort, guests, reservation system, data system, or other feature or location connected with Seller; (2) Owner reserves the right to file a Dispute in small claims court in Florida, as long as the matter remains in small claims court and proceeds only on an individual basis; and (3) No provision of this Dispute Resolution/Arbitration provision shall limit the right of any party to seek and use any available remedies, judicial or otherwise, for the purpose of foreclosing upon or accelerating any debt secured by any property that is involved in any Dispute or subject to any Note, Promissory Notes, Mortgage Deed or Mortgage (the "Loan Documents") executed by the Parties.  Any such acceleration or foreclosure process shall be governed by the terms of the Loan Documents and applicable foreclosure law and procedures, may occur outside the arbitration process if either of the Parties so elects, and shall not be deemed a waiver of the right to arbitrate any other issue involved in a Dispute.

e. **Applicable Rules/Location.** This arbitration agreement is governed by the Federal Arbitration Act (9 U.S.C. § 1 et seq.). The arbitration shall be administered by the American Arbitration Association (**"AAA"**) under its Consumer Arbitration Rules, available online at www.adr.org or by calling the AAA at 1-800-778-7879 (the **"AAA Rules"**), **except** that the Parties expressly agree that the AAA Supplementary Class Rules **shall not** apply, given the express class waiver above, and further agree that Rules 14(a) and 53 of the Consumer Arbitration Rules **shall not** authorize any arbitrator or court to find that any class, mass, collective or representative claim may be arbitrated. **The arbitration shall be held in the County of Orange, State of Florida, unless the Parties agree to another location in writing, or the arbitrator decides to hold a telephonic hearing, to reach a decision based solely on the Parties' submission of documents, or to designate another location reasonably convenient for the Parties.** In the event of any conflict between the AAA Rules and this Agreement, the provisions of this Agreement shall be controlling.

f. **Stay of Proceedings.** In the event that a Dispute involves both issues that are subject to arbitration and issues that are not subject to arbitration, the Parties unequivocally agree that any legal proceeding regarding the issues not subject to arbitration shall be stayed pending resolution of the issues subject to arbitration, except for any proceedings described in Paragraph 33(d) above, which actions shall proceed without a stay.

g. **Final and Binding.** The arbitration award shall be final and binding on the Parties.  Judgment on the arbitrator's award may be entered in any state or federal court of competent jurisdiction.

h. **Payment of Fees.** The payment of all fees for registration, filing and administration of the arbitration, and the payment of arbitrator fees, shall be governed by the AAA Rules and applicable law, unless otherwise stated in this Agreement.  The Parties shall bear their own legal fees and legal expenses for any arbitration proceeding.

IIIIIII2222222222222

Contract Number **00123-1807991**

i. **Notice and Good Faith Negotiation.** Any Party intending to file an arbitration demand against the other Party must notify the other Party at least thirty (30) days before filing. The Parties agree to attempt to negotiate a mutually agreeable resolution to resolve any such dispute or claim during this period. If a Party filing an arbitration demand fails to provide that notice, the other Party is entitled to seek a stay of the arbitration proceeding from the AAA for thirty (30) days and to participate in settlement negotiations during that period in good faith.

**34. Complete Waiver of Jury Trial.** TO THE EXTENT A CLAIM BY ONE OF THE PARTIES AGAINST THE OTHER PARTY IS NOT SUBJECT TO THE ARBITRATION PROVISION IN PARAGRAPH 33 OR TO THE EXTENT AN OTHERWISE ARBITRABLE DISPUTE IS LITIGATED IN COURT, THE PARTIES HEREBY UNCONDITIONALLY WAIVE ANY RIGHT TO A JURY TRIAL OF ANY AND ALL SUCH CLAIMS, DISPUTES, OR CAUSES OF ACTION, WHETHER NOW EXISTING OR HEREAFTER ARISING, OF ANY KIND. EACH OF THE PARTIES HEREBY AGREES THAT THE PARTIES MAY FILE A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE WAIVER OF ANY RIGHT TO TRIAL BY JURY.

**35. Complete Waiver of Class Action.** TO THE EXTENT A CLAIM OR DISPUTE IS NOT SUBJECT TO THE ARBITRATION PROVISION IN PARAGRAPH 33 OR TO THE EXTENT AN OTHERWISE ARBITRABLE DISPUTE IS LITIGATED IN COURT, THE PARTIES AGREE TO WAIVE ANY RIGHT TO PARTICIPATE IN A CLASS, MASS, OR OTHER COLLECTIVE ACTION, AND THE PARTIES WAIVE ANY RIGHT TO BRING, JOIN, OR PARTICIPATE IN ANY REPRESENTATIVE OR OTHER CLAIM BROUGHT ON BEHALF OF THE GENERAL PUBLIC, OTHER PURCHASERS, OR OTHER PERSONS SIMILARLY SITUATED.

**36. Governing Law.** If the Owner was solicited in Nevada, such Party retains those rights granted under chapter 119A of Nevada Revised Statutes. The Parties agree that this Agreement evidences a transaction involving interstate commerce so as to ensure the applicability of the Federal Arbitration Act (*"FAA"*). In the event of a conflict between applicable state law and the FAA, the FAA shall govern. If any portion of this Agreement is deemed invalid or unenforceable, the remainder of the Agreement shall remain in force.

**37. Limitation of Liability.** OWNER EXPRESSLY AGREES THAT IN NO EVENT SHALL SELLER, ITS PARENT, SUBSIDIARIES, AFFILIATES, SUCCESSORS, OR ASSIGNS BE LIABLE TO OWNER FOR CONSEQUENTIAL, INDIRECT, INCIDENTAL, SPECIAL, EXEMPLARY, PUNITIVE, OR ENHANCED DAMAGES ARISING OUT OF, RELATING TO, AND/OR IN CONNECTION WITH THE MARKETING PROCESS, SALES PROCESS, PURCHASE OF THE OWNERSHIP, USE OF THE OWNERSHIP, AND/OR ANY BREACH OF THIS AGREEMENT. **SELLER'S MAXIMUM LIABILITY TO OWNER ARISING OUT OF OR RELATED TO THIS AGREEMENT, WHETHER ARISING OUT OF OR RELATED TO BREACH OF CONTRACT, TORT (INCLUDING NEGLIGENCE), OR OTHERWISE, SHALL BE THE TOTAL AMOUNT PAID TO SELLER UNDER THIS AGREEMENT.** OWNER EXPRESSLY WAIVES ANY RIGHT TO SEEK RELIEF IN EXCESS OF THE LIMITATION OF LIABILITY SPECIFIED IN THIS PARAGRAPH.

**I have read and agree to the Dispute Resolution/Arbitration Clause:**

**INITIALS: Owner(s)** _____, _____, _____, _____

[REMAINING PAGE INTENTIONALLY LEFT BLANK]

**38. Effectiveness of Agreement/Closing.**  This Agreement will become effective upon execution by all parties and shall be deemed to have closed (the *"Closing"*) when all of the following conditions have occurred unless waived by Seller or Wyndham: (a) any applicable rescission period has expired; and (b) the Owner has paid to Seller a down payment equal to not less than ten percent (10%) of the sum of the Purchase Price and the Processing Fee in immediately available funds.  In no event will the Closing occur later than the first anniversary of the Contract Date and if Closing has not occurred on or prior to the date of the first anniversary of the Contract Date, this Agreement shall be deemed automatically terminated and of no further force and effect.  In the event this Agreement is automatically terminated in accordance with the provisions of the immediately preceding sentence and the Closing does not occur through no fault of Owner then within twenty (20) days after the first anniversary of the Contract Date, Owner may request Seller to refund to Owner all funds paid by Owner under this Agreement.

**39. Termination of Agreement with Blocked Persons.**  Under United States Presidential Executive Order 13224 (the *"Executive Order"*), Seller is required to ensure that it does not transact business with persons or entities determined to have committed, or pose a risk of committing or supporting, terrorist acts and those identified on the list of Specially Designated Nationals and Blocked Persons (the *"List"*), generated by the Office of Foreign Assets Control of the U.S. Department of the Treasury.  The names or aliases of these persons or entities (*"Blocked Persons"*) are updated from time to time.  In the event Seller learns that Owner's name appears on the List, Seller reserves the right to delay the Closing pending Seller's investigation into the matter. If Seller is advised and/or determines that Owner is a Blocked Person, Seller reserves the right to terminate this Agreement and/or to take all other actions necessary to comply with the requirements of the Executive Order.  The provisions of this Section will survive Closing and/or termination of this Agreement.

**40. Purchase Money Protection.**  All payments made by the Owner shall be protected by a surety bond held by First American Title Insurance Company, 400 International Parkway, Suite 380, Lake Mary, Florida 32746 (*"Escrow Agent"*), from the date of sale until expiration of the cancellation period has occurred.

**41. Vacation Interest Policy.**  Owner will be provided a vacation interest insurance policy covering the Ownership at no additional charge.

**42. Definition of Terms.**  All capitalized terms not otherwise defined within this Agreement shall have the meaning given to them in the Club Instruments.

**43. Electronic Signatures.**  Owner(s) agrees that if this Agreement is signed electronically by the Owner (s), it is a transferable record.

**44. Receipt for Documents.  Owner acknowledges that the Owner has received a completed copy of this Agreement, required disclosure documents, including without limitation, the Public Offering Statement, Articles of Incorporation and By-laws of the Association, the Declaration for the ClubWyndham Access Vacation Ownership Plan and the Regulations for the Club, and that the Owner has been given a satisfactory opportunity to read this Agreement.**

[REMAINING PAGE INTENTIONALLY LEFT BLANK]

IIIIIII2222222222222

Contract Number  00123-1807991

## NOTICE TO BUYER (OWNER):

**(a) RECEIPT.** Owner has received an exact copy of this agreement and any other document(s) signed with this agreement, with all blanks filled in.

**(b)** This contract is to be construed according to the laws of Nevada and specifically chapter 119A of NRS.

**(c)** The purchaser of a time share may cancel, by written notice, the contract of sale until midnight of the fifth calendar day after the date of execution of the contract.

**(d)** The right of cancellation may not be waived. Any attempt by the developer to obtain a waiver results in a contract, which is voidable by the purchaser.

**(e)** The notice of cancellation may be delivered personally to the developer, sent by certified mail, return receipt requested, or sent by express, priority or recognized overnight delivery service, with proof of service to the business address of the developer to Wyndham Vacation Resorts, Inc., Attention: Account Servicing Operations - Rescission Department at P.O. Box 94443, Las Vegas, Nevada 89193 or 10750 West Charleston Boulevard, Suite 130, Las Vegas, Nevada 89135.

**(f)** The developer shall, within twenty (20) days, after receipt of the notice of cancellation, return all payments made by the purchaser.

| | | |
|---|---|---|
| X _TIMOTHY ERIC SABELLA_ | 4/20/2018 | X _JUDY A SABELLA_    4/20/2018 |
| Owner  Timothy Eric Sabella | Date Signed | Owner  Judy A Sabella    Date Signed |
| | | |
| X _____ | | X _____ |
| Owner | Date Signed | Owner    Date Signed |

Joint and several if more than one Owner

Street Address _____

WYNDHAM VACATION RESORTS, INC. and PTVO Owners Association, Inc.

City _____    State ___    Zip ___

X _Jesse Ibarra_    4/20/2018

Phone (area code) _____

Authorized Agent    Date Signed

Email Address _____

Principal Contact _____

Contract No.  **00123-1807991**

## ELECTRONIC DELIVERY ACKNOWLEDGMENT

Yes _____   The undersigned purchaser(s) acknowledge that they have chosen **not** to receive all documents related to this purchase electronically and will receive a printed copy of all sales documents.

No  _____   The undersigned purchaser(s) acknowledge that they have chosen to receive all documents related to this purchase electronically; however they will receive a printed copy of their sales contract.

Purchaser(s) should not select electronic delivery of documents unless they can be viewed prior to the end of their cancellation period.

Dated this **20th** day of **April, 2018.**

TIMOTHY ERIC SABELLA
Purchaser

JUDY A SABELLA
Purchaser

**Timothy Eric Sabella**
Print Name

**Judy A Sabella**
Print Name

Purchaser

Purchaser

Print Name

Print Name

No. 2866/Rev. 2-16

 **WYNDHAM**

## Acknowledgement Receipt
### for Disclosure Documents

Contract No. **00123-1807991**

Owner(s) hereby acknowledges that Owner has received copies of the documents and disclosures listed below.

- Home Loan Toolkit Brochure
- Governing Documents for CLUBWYNDHAM ACCESS VACATION OWNERSHIP PLAN
- Trust Agreement and Accompanying Documents
- CLUB WYNDHAM Plus Program Summary
- WYNDHAM CLUB PASS, LLC - Disclosure Summary for Wyndham Club Pass Program
- CLUB WYNDHAM Plus Program - Points Chart for Club Brazil
- CLUB WYNDHAM Plus Member's Directory
- UCC Vacation Interest Policy
- Ownership Certificate
- Acknowledgment and Disclosure Statement for CLUB WYNDHAM Plus/Wyndham Rewards Program
- Wyndham Vacation Ownership - Financial Privacy Policy
- Servicing Disclosure Statement
- 30 Day Interest Free Certificate

| | |
|---|---|
| *TIMOTHY ERIC SABELLA* | 4/20/2018 |
| Owner **Timothy Eric Sabella** | Date |
| *JUDY A SABELLA* | 4/20/2018 |
| Owner **Judy A Sabella** | Date |
| | |
| Owner | Date |
| | |
| Owner | Date |

No. 2932/Rev. 6-17

8-2014
Contract No. **00123-1807991**

| FACTS | WHAT DOES WYNDHAM VACATION OWNERSHIP DO WITH YOUR PERSONAL INFORMATION? |
|---|---|
| **Why?** | Financial companies choose how they share your personal information. Federal law gives consumers the right to limit some but not all sharing. Federal law also requires us to tell you how we collect, share, and protect your personal information. Please read this notice carefully to understand what we do. |
| **What?** | The types of personal information we collect and share depend on the product or service you have with us. This information can include:<br>• Social Security number and income<br>• Credit scores and payment history<br>• Purchase history and account transactions |
| **How?** | All financial companies need to share customers' personal information to run their everyday business. In the section below, we list the reasons financial companies can share their customers' personal information; the reasons Wyndham Vacation Ownership chooses to share; and whether you can limit this sharing. |

| Reasons we can share your personal information | Does Wyndham Vacation Ownership share? | Can you limit this sharing? |
|---|---|---|
| **For our everyday business purposes -** such as to process your transactions, maintain your account(s), respond to court orders and legal investigations, or report to credit bureaus | Yes | No |
| **For our marketing purposes -** To offer our products and services to you | Yes | No |
| **For joint marketing with other financial companies** | Yes | No |
| **For our affiliates' everyday business purposes -** Information about your transactions and experiences | Yes | No |
| **For our affiliates' everyday business purposes -** Information about your creditworthiness | Yes | Yes |
| **For our affiliates to market to you** | Yes | Yes |
| **For nonaffiliates to market to you** | Yes | Yes |

| To limit our sharing | • Mail in the form below<br><br>Please note:<br><br>If you are a *new* customer, we can begin sharing your information 30 days from the date we sent this notice. When you are *no longer* our customer, we continue to share your information as described in this notice.<br><br>However, you can contact us at any time to limit our sharing. |
|---|---|

| Questions? | Call (WVR)   800-251-8736   or go to   www.wyndhamvacationresorts.com<br>Call (WBW)   888-648-7363   or go to   www.worldmarkbywyndham.com<br>Call (MGVC)   866-645-4775   or go to   www.mymargaritavillevacationclub.com |
|---|---|

| Mail-in Form | |
|---|---|
| If you have a joint account, your choice(s) will apply to everyone on your account unless you mark below.<br>___ Apply my choices only to me | Mark any/all you want to limit:<br><br>___ Do not share my personal information with nonaffiliates to market their products and services to me.<br><br>___ Do not share information about my creditworthiness with your affiliates for their everyday business purposes.<br><br>___ Do not allow affiliates to use my personal information to market to me. |
| | Name<br>Address<br><br>City, State Zip<br>Member / Contract # |
| Mail To: | Member Privacy (Identify Wyndham Vacation Resorts, WRDC/WorldMark by Wyndham, or other) P.O. Box 98944 Las Vegas, Nevada 89193-8944 |

Contract No. **00123-1807991**

No. 2537/Rev. 8-14

Contract No.00123-1807991

Page 2

| Who we are | |
|---|---|
| Who is providing this notice? | Wyndham Vacation Ownership (Wyndham Vacation Resorts, Wyndham Resort Development Corp, Wyndham Consumer Finance) |

| What we do | |
|---|---|
| How does Wyndham Vacation Ownership protect my personal information? | To protect your personal information from unauthorized access and use, we use security measures that comply with federal law. These measures include computer safeguards and secured files and buildings. |
| How does Wyndham Vacation Ownership collect my personal information? | We collect your personal information, for example, when you<br>• Apply for financing or give us your income information<br>• Provide account information or provide employment information<br>• Give us your contact information<br>We also collect your information from others, such as credit bureaus, affiliates, or other companies |
| Why can't I limit all sharing? | Federal law gives you the right to limit only<br>• sharing for affiliates' everyday business purposes--information about your creditworthiness<br>• affiliates from using your information to market to you<br>• sharing for nonaffiliates to market to you<br>State laws and individual companies may give you additional rights to limit sharing. See below for more on your rights under state law. |
| What happens when I limit sharing for an account I hold jointly with someone else? | Your choices will apply to everyone on your account unless you tell us otherwise. |

| Definitions | |
|---|---|
| Affiliates | Companies related by common ownership or control. They can be financial and nonfinancial companies.<br>• *Our affiliates include companies with a Wyndham name including, Wyndham Vacation Resorts, Wyndham Resort Development Corp,, Wyndham Consumer Finance.* |
| Nonaffiliates | Companies not related by common ownership or control. They can be financial and nonfinancial companies.<br>• *Nonaffiliates we may share with may include other developers, financial institutions and services companies, associations and exchanges, and other companies.* |
| Joint marketing | A formal agreement between nonaffiliated financial companies that together market financial products or services to you.<br>• *Our joint marketing partners may include other developers, financial institutions, financial services companies, and other companies* |

---

**Other important information**

**VT:** Accounts with a Vermont mailing address are automatically treated as if they have limited the sharing as described on page 1. For joint marketing we will only disclose your name, contact information and information about your transactions.

**CA:** Accounts with a California mailing address are automatically treated as if they have limited the sharing with nonaffiliates as described on page 1. You may receive a separate notice regarding your rights and additional choices.

Contract Number: **00123-1807991**

## Servicing Disclosure Statement

Lender:   **Wyndham Vacation Resorts, Inc.**

Address:  **6277 Sea Harbor Dr., Orlando, FL 32821**

Date:     **04-20-2018**

SERVICING DISCLOSURE STATEMENT NOTICE TO FIRST LIEN MORTGAGE
LOAN APPLICANTS: THE RIGHT TO COLLECT YOUR MORTGAGE LOAN
PAYMENTS MAY BE TRANSFERRED

You are applying for a mortgage loan covered by the Real Estate Settlement
Procedures Act (**"RESPA"**) (12 U.S.C. 2601 *et seq.*). RESPA gives you certain rights
under Federal law. This statement describes whether the servicing for this loan may be
transferred to a different loan servicer. **"Servicing"** refers to collecting your principal,
interest, and escrow payments, if any, as well as sending any monthly or annual
statements, tracking account balances, and handling other aspects of your loan. You
will be given advance notice before a transfer occurs.

*Servicing Transfer Information* [Check the applicable provision]

☒ We may assign, sell, or transfer the servicing of your loan while the loan is
outstanding.

☐ We do not service mortgage loans of the type for which you applied. We intend to
assign, sell, or transfer the servicing of your mortgage loan before the first payment
is due.

☐ The loan for which you have applied will be serviced at this financial institution and
we do not intend to sell, transfer, or assign the servicing of the loan.

 **WYNDHAM**

Contract No. **00123-1807991**

# 30 DAYS INTEREST FREE CERTIFICATE

Date:      **04-20-2018**

Buyer(s):      **TIMOTHY ERIC  SABELLA and JUDY A SABELLA**

This certificate gives you the option of paying no interest if you pay the total pay off amount of **$19,846.65** within 30 days of the date listed above.

Please make your personal check payable to **"WYNDHAM VACATION RESORTS, INC."** and mail it along with a copy of this form to Wyndham Consumer Finance at P.O. Box 98940, Las Vegas, Nevada 89193-8940. **In order to honor this certificate, payment needs to be received within 30 days from the date above.** Please direct all questions to the Financial Services department at: (888) 739-4016 (English/Spanish), (800) 308-8072 (Portuguese) or (866) 331-1209 (Japanese).

**Credit Card or Other:** Call Toll Free:      1-888-739-4016 (English/Spanish)
1-800-308-8072 (Portuguese)
1-866-331-1209 (Japanese)
8:00am to 8:00pm Eastern Monday-Friday
9:00am to 6:00pm Eastern Saturday-Sunday

 **WYNDHAM**

Contract No. **00123-1807991**
Member No. **00203461007**

## ACKNOWLEDGMENT AND DISCLOSURE STATEMENT

### Club Wyndham® Plus/Wyndham Rewards℠ Program

1. The CLUB WYNDHAM Plus/Wyndham Rewards Program as more fully described by the Program Rules herein.

2. Use and participation in the CLUB WYNDHAM Plus/Wyndham Rewards Program is completely voluntary and the payment of any fee or other cost is only required upon such use or participation.

3. The CLUB WYNDHAM Plus/Wyndham Rewards Program is not assignable or otherwise transferable.

4. If all or a portion of the CLUB WYNDHAM Plus/Wyndham Rewards Program becomes unavailable the offering of this program may be terminated.

5. The continued availability of the CLUB WYNDHAM Plus/Wyndham Rewards Program is not necessary for a purchaser's use and enjoyment of any accommodations in the timeshare plan purchased.

6. If you cancel your purchase contract within the stated cancellation period, the CLUB WYNDHAM Plus/Wyndham Rewards Program will not be available.

### Club Wyndham® Plus/Wyndham Rewards℠ Program Rules

The CLUB WYNDHAM Plus/Wyndham Rewards Program Rules (*"Rules"*) are promulgated this 20th day of July, 2009, by Wyndham Fulfillment Group, LLC (*"Wyndham Fulfillment Group"*) for the benefit of CLUB WYNDHAM Plus Members. The Rules are as follows:

#### Program Rules

a. The CLUB WYNDHAM Plus/Wyndham Rewards Program (*"Program"* ) means that program offered by Wyndham Fulfillment Group in which CLUB WYNDHAM Plus Members may trade Qualified CLUB WYNDHAM Plus Points for Wyndham Rewards points. All terms used herein shall have the same meaning given to them in the documents creating the CLUB WYNDHAM Plus program, as amended from time to time.

b. The Wyndham Rewards Program is offered by Travel Rewards, Inc., a subsidiary of Wyndham Hotel Group, LLC, its successors and assigns, for use by guests of participating Wyndham hotel and resort properties whereby such guests can accumulate points redeemable for, among other things, hotel rooms at participating Wyndham hotels and resorts worldwide, car rentals, travel activities, and purchases from participating merchants or service providers. The rules for the Wyndham Rewards Program will be distributed separately from this document, and are incorporated herein by reference as if fully set forth. (See current Wyndham Rewards Membership Guide).

c. Neither Wyndham Fulfillment Group nor Wyndham Vacation Ownership, Inc., or its subsidiaries guarantee that a CLUB WYNDHAM Plus Member utilizing the Wyndham Rewards Program will be able to stay at a particular participating Wyndham hotel or resort during any specific time or will be able to redeem Wyndham Rewards points for any particular activity or service.

d. Wyndham Fulfillment Group reserves the right to modify, alter, delete or add new terms and conditions to the Program Rules at any time without notice. Wyndham Fulfillment Group may terminate the Program at any time by providing written notice to CLUB WYNDHAM Plus Members. In that event, the right to trade Qualified CLUB WYNDHAM Plus Points for Wyndham Rewards points will end. Travel Rewards, Inc. may terminate the Wyndham Rewards Program at any time as described in the current Wyndham Rewards Membership Guide.

e. Travel Rewards, Inc. reserves the right to modify, alter, delete or add new terms and conditions to the Wyndham Rewards Program at any time without notice. This includes modifying, altering, adding or deleting Wyndham Rewards point values, redemption levels, conversion ratios, conditions for active status, rewards, "Earning Participants" or "Rewards Participants" to the Wyndham Rewards Program at any time without notice. In addition, Travel Rewards, Inc. may convert the Wyndham Rewards Program and members points into different awards programs having different point values at any time without notice. This means that the number of Wyndham Rewards points needed to reach a rewards level may be increased, the time for earning them reduced, or the rewards changed, so you may not be able to obtain, earn or claim certain rewards no matter how long you participate in the Wyndham Rewards Program. To view or obtain the most up to date terms and conditions for the Wyndham Rewards Program, visit wyndhamrewards.com or call 1-866-996-7937.

No. 2242/Rev. 9-15

Contract No. **00123-1807991**
Member No. **00203461007**

f. All redemption of Wyndham Rewards points will be in accordance with the procedures outlined in the Wyndham Rewards Membership Guide. A Wyndham Rewards account may be maintained in the name of each CLUB WYNDHAM Plus Member, however, Wyndham Rewards points will be credited to only one Wyndham Rewards account, not multiple accounts, based upon direction received by CLUB WYNDHAM Plus from the member where the CLUB WYNDHAM Plus membership is held by more than one individual.

g. CLUB WYNDHAM Plus Members may request to trade all or part of their regular use year Qualified CLUB WYNDHAM Plus Points for Wyndham Rewards points during the twelve (12) month period prior to their use year start date. A minimum of 1,000 Qualified CLUB WYNDHAM Plus Points may be traded for Wyndham Rewards points. Requests to trade for Wyndham Rewards points are non-reversible and are considered a final transaction. Multiple requests are permitted provided they are submitted prior to the CLUB WYNDHAM Plus Member's use year start date.

h. "Qualified CLUB WYNDHAM Plus Points" means those CLUB WYNDHAM Plus Points associated with ownership interests purchased directly through Wyndham Vacation Resorts, Inc. or its affiliates, such ownership interests acquired by will or intestate succession, or such ownership interests acquired by an "Immediate Relative" of the CLUB WYNDHAM Plus Member. "Immediate Relative" includes parents, spouses, domestic partners, siblings, children and grandchildren. Wyndham Fulfillment Group, in its sole discretion, with or without prior notice, has the unilateral right to expand or contract the list of persons eligible to participate in the Program at any time in the future.

i. Subject to Paragraphs (g) and (h) above, the following CLUB WYNDHAM Plus Points are not eligible to be traded for Wyndham Rewards points: CLUB WYNDHAM Plus Points which are not acquired through Wyndham Vacation Resorts, Inc. or its affiliates, CLUB WYNDHAM Plus Points acquired through a non-Wyndham affiliated broker, Bonus Points, PIC Points, Borrowed CLUB WYNDHAM Plus Points, Rented CLUB WYNDHAM Plus Points, Transferred CLUB WYNDHAM Plus Points, Discovery Program Points and Pool Credits. Wyndham Fulfillment Group, in its sole discretion, with or without prior notice, has the unilateral right to expand or contract the list of eligible CLUB WYNDHAM Plus Points which may be traded for Wyndham Rewards points.

j. Participation in the Program, which includes the ability to request a trade for Wyndham Rewards points and the depositing of Wyndham Rewards points in a CLUB WYNDHAM Plus Members Wyndham Rewards account, will not be allowed if the CLUB WYNDHAM Plus Member is delinquent in the payment of any applicable maintenance fees, taxes, special assessments, or CLUB WYNDHAM Plus Program Fees. Participation will also not be allowed by CLUB WYNDHAM Plus Members with delinquent mortgage payments to Wyndham Vacation Ownership, Inc., or a subsidiary thereof, or who are otherwise in default under their sales contract, if any. In addition, a CLUB WYNDHAM Plus Member will not be permitted to request a trade for Wyndham Rewards points if their vacation ownership account is pending an upgrade transaction.

k. CLUB WYNDHAM Plus Members may trade for Wyndham Rewards points every other calendar year. Each request to trade will require a separate transaction fee.

l. The fee to trade for Wyndham Rewards points is payable at the time each request to trade for Wyndham Rewards points is made. The current fee is $99.00, is non-refundable, and is subject to change without notice.

m. Upon requesting a trade of Qualified CLUB WYNDHAM Plus Points for Wyndham Rewards points, the Qualified CLUB WYNDHAM Plus Points traded through the Program will be assigned to Wyndham Fulfillment Group for its own purposes including, but not limited to, renting accommodations to the public.

n. Wyndham Rewards points will become available to the CLUB WYNDHAM Plus Member for use at the start of the use year corresponding with the Qualified CLUB WYNDHAM Plus Points that are traded.

o. The Wyndham Rewards points which may be received when trading Qualified CLUB WYNDHAM Plus Points is based on the following formula: 400 Wyndham Rewards points for each 1,000 Qualified CLUB WYNDHAM Plus Points traded. Wyndham Fulfillment Group reserves the right to change the above formula at any time without notice.

p. Questions relating to the Program or trading Qualified CLUB WYNDHAM Plus Points for Wyndham Rewards points should be directed to the Vacation Planning Center (1-800-251-8736 Option 1).

No. 2242/Rev. 9-15

 **WYNDHAM**

Contract No. **00123-1807991**
Member No. **00203461007**

# Acknowledgement of Price Freeze

## One Year Price Freeze

### *Lock in today's prices for the next 12 months.*

**Terms and Conditions**

- Future purchases will be locked in at the price that inventory is selling for today. This offer does not include special discounts or Presidential Reserve inventory.

- To be eligible, you must be in good standing and must not be delinquent in the payment of any maintenance fees, taxes, special assessments, CLUB WYNDHAM® Plus Program Fees, or loan payments.

- Your price freeze will expire 12 months from the date on which a purchase agreement is fully executed.

- Subject to availability.

6277 Sea Harbor Dr.
Orlando, FL 32821

# Closing Disclosure

*This form is a statement of final loan terms and closing costs. Compare this document with your Loan Estimate.*

| Closing Information | | Transaction Information | | Loan Information | |
|---|---|---|---|---|---|
| Date Issued | 04-20-2018 | Borrower | TIMOTHY ERIC SABELLA AND JUDY A SABELLA | Loan Term | 10 years |
| Closing Date | 04-20-2018 | | | Purpose | Purchase |
| Disbursement Date | 04-20-2018 | | | Product | Adjustable Rate |
| Settlement Agent | WYNDHAM VACATION RESORTS, INC. | | | | |
| File # | | Seller | WYNDHAM VACATION RESORTS, INC. | Loan Type | ☒ Conventional   ☐ FHA |
| Property | 6277 SEA HARBOR DR. ORLANDO, FL 32821 | | 6277 SEA HARBOR DR. ORLANDO, FL 32821 | | ☐ VA ☐ _____ |
| | | | | Loan ID # | 00123-1807991 |
| | | | | MIC# | |
| Sales Price | $23,000.00 | Lender | WYNDHAM VACATION RESORTS, INC. 6277 SEA HARBOR DR. ORLANDO, FL 32821 | | |

## Loan Terms

| | | Can this amount increase after closing? |
|---|---|---|
| **Loan Amount** | $19,846.65 | No |
| **Interest Rate** | 14.99% | No |
| **Monthly Principal & Interest** *See Projected Payments below for your Estimated Total Monthly Payment* | $322.13 | No |
| | | Does the loan have these features? |
| **Prepayment Penalty** | | No |
| **Balloon Payment** | | No |

## Projected Payments

| Payment Calculation | 10 years | | |
|---|---|---|---|
| Principal & Interest | $322.13 | | |
| Mortgage Insurance | | | |
| Estimated Escrow *Amount can increase over time* | | | |
| **Estimated Total Monthly Payment** | $322.13 | | |

| **Estimated Taxes, Insurance & Assessments** *Amount can increase over time* *See page 4 for details* | $73.92 a month | **This estimate includes** ☒ Property Taxes ☒ Homeowner's Insurance ☒ Other: Annual Maintenance Fee / Annual Dues *See Escrow Account on page 4 for details. You must pay for other property costs separately.* | **In escrow?** No No No |
|---|---|---|---|

## Costs at Closing

| **Closing Costs** | $30.00 | Includes  $0.00  in Loan Costs +  $30.00  in Other Costs – $0.00 in Lender Credits. *See page 2 for details.* |
|---|---|---|
| **Cash to Close** | $3,532.35 | Includes Closing Costs. *See Calculating Cash to Close on page 3 for details.* |

## Closing Cost Details

| Loan Costs | Borrower-Paid | | Seller-Paid | | Paid by Others |
|---|---|---|---|---|---|
| | At Closing | Before Closing | At Closing | Before Closing | |
| **A. Origination Charges** | | | | | |
| 01    % of Loan Amount (Points) | | | | | |
| 02 | | | | | |
| 03 | | | | | |
| 04 | | | | | |
| 05 | | | | | |
| 06 | | | | | |
| 07 | | | | | |
| 08 | | | | | |
| **B. Services Borrower Did Not Shop For** | | | | | |
| 01 | | | | | |
| 02 | | | | | |
| 03 | | | | | |
| 04 | | | | | |
| 05 | | | | | |
| 06 | | | | | |
| 07 | | | | | |
| 08 | | | | | |
| 09 | | | | | |
| 10 | | | | | |
| **C. Services Borrower Did Shop For** | | | | | |
| 01 | | | | | |
| 02 | | | | | |
| 03 | | | | | |
| 04 | | | | | |
| 05 | | | | | |
| 06 | | | | | |
| 07 | | | | | |
| 08 | | | | | |
| **D. TOTAL LOAN COSTS (Borrower-Paid)** | | | | | |
| Loan Costs Subtotals (A + B + C) | | | | | |

| Other Costs | Borrower-Paid | | Seller-Paid | | Paid by Others |
|---|---|---|---|---|---|
| | At Closing | Before Closing | At Closing | Before Closing | |
| **E. Taxes and Other Government Fees** | | | | | |
| 01  Recording Fees    Deed $ 0.00    Mortgage $ 0.00    Release $ 0.00 | $0.00 | | | | |
| 02  State tax/Stamps  Deed $ 0.00                              Mortgage $ 0.00 | $0.00 | | | | |
| 03  Excise tax $ | | | | | |
| 04  Intangible tax $   0.00 | $0.00 | | | | |
| **F. Prepaids** | | | | | |
| 01  Homeowner's Insurance Premium (     mo.) | | | | | |
| 02  Mortgage Insurance Premium (     mo.) | | | | | |
| 03  Prepaid Interest (        per day from        to        ) | | | | | |
| 04  Property Taxes (     mo.) | | | | | |
| 05 | | | | | |
| **G. Initial Escrow Payment at Closing** | | | | | |
| 01  Homeowner's Insurance        per month for    mo. | | | | | |
| 02  Mortgage Insurance        per month for    mo. | | | | | |
| 03  Property Taxes        per month for    mo. | | | | | |
| 04 | | | | | |
| 05 | | | | | |
| 06 Aggregate Adjustment | | | | | |
| **H. Other** | | | | | |
| 01  Closing Fee (Paid to First American Title) | $30.00 | | | | |
| 02 | | | | | |
| 03  Government Surcharge (Paid to Title Insurer) | | | | | |
| 04  Owner's Title Policy (Optional) | $0.00 | | | | |
| 05  Settlement Fee | $0.00 | | | | |
| **I. TOTAL OTHER COSTS (Borrower-Paid)** | $30.00 | | | | |
| Other Costs Subtotals (E + F + G + H) | $30.00 | | | | |

| | Borrower-Paid | | Seller-Paid | | Paid by Others |
|---|---|---|---|---|---|
| | At Closing | Before Closing | At Closing | Before Closing | |
| **J. TOTAL CLOSING COSTS (Borrower-Paid)** | $30.00 | | | | |
| Closing Costs Subtotals (D + I) | $30.00 | | | | |
| Lender Credits | | | | | |

## Calculating Cash to Close

Use this table to see what has changed from your Loan Estimate.

| | Loan Estimate | Final | Did this change? |
|---|---|---|---|
| Total Closing Costs (J) | $0.00 | $30.00 | Yes, see Total Closing Cost in Section J |
| Closing Costs Paid Before Closing | $0.00 | $0.00 | No |
| Closing Costs Financed (Paid from your Loan Amount) | $0.00 | $0.00 | No |
| Down Payment/Funds from Borrower | $0.00 | $3,502.35 | Yes, see Cash To Close |
| Deposit | $0.00 | $0.00 | No |
| Funds for Borrower | $0.00 | $0.00 | No |
| Seller Credits | $0.00 | $0.00 | No |
| Adjustments and Other Credits | $0.00 | $0.00 | No |
| Cash to Close | $0.00 | $3,532.35 | No |

## Summaries of Transactions

Use this table to see a summary of your transaction.

### BORROWER'S TRANSACTION

| K. Due from Borrower at Closing | | | $23,379.00 |
|---|---|---|---|
| 1 | Sale Price of Property | | $23,000.00 |
| 2 | Sale Price of Any Personal Property Included in Sale | | |
| 3 | Closing Costs Paid at Closing (J) | | $30.00 |
| 04 | | | |
| **Adjustments** | | | |
| 05 | Processing Fee | | $349.00 |
| 06 | | | |
| 07 | | | |
| **Adjustments for Items Paid by Seller in Advance** | | | |
| 8 | City/Town Taxes | to | |
| 9 | County Taxes | to | |
| 10 | Assessments | to | |
| 11 | | | |
| 12 | | | |
| 13 | | | |
| 14 | | | |
| 15 | | | |

| L. Paid Already by or on Behalf of Borrower at Closing | | | $(19,846.65) |
|---|---|---|---|
| 1 | Deposit | | |
| 2 | Loan Amount | | $19,846.65 |
| 3 | Existing Loan(s) Assumed or Taken Subject to | | |
| 04 | | | |
| 05 | Seller Credit | | |
| **Other Credits** | | | |
| 06 | Traded Equity | | $0.00 |
| 07 | | | |
| **Adjustments** | | | |
| 08 | | | |
| 09 | | | |
| 10 | | | |
| 11 | | | |
| **Adjustments for Items Unpaid by Seller** | | | |
| 12 | City/Town Taxes | to | |
| 13 | County Taxes | to | |
| 14 | Assessments | to | |
| 15 | | | |
| 16 | | | |
| 17 | | | |

#### CALCULATION

| Total Due from Borrower at Closing (K) | $23,379.00 |
|---|---|
| Total Paid Already by or on Behalf of Borrower at Closing (L) | $(19,846.65) |
| Cash to Close ☒ From ☐ To Borrower | $3,532.35 |

### SELLER'S TRANSACTION

| M. Due to Seller at Closing | | | $23,349.00 |
|---|---|---|---|
| 1 | Sale Price of Property | | $23,000.00 |
| 2 | Sale Price of Any Personal Property Included in Sale | | |
| 03 | | | |
| 04 | | | |
| 05 | Processing Fee | | $349.00 |
| 06 | | | |
| 07 | | | |
| 08 | | | |
| **Adjustments for Items Paid by Seller in Advance** | | | |
| 9 | City/Town Taxes | to | |
| 10 | County Taxes | to | |
| 11 | Assessments | to | |
| 12 | | | |
| 13 | | | |
| 14 | | | |
| 15 | | | |
| 16 | | | |

| N. Due from Seller at Closing | | | |
|---|---|---|---|
| 1 | Excess Deposit | | |
| 2 | Closing Costs Paid at Closing (J) | | |
| 3 | Existing Loan(s) Assumed or Taken Subject to | | |
| 4 | Payoff of First Mortgage Loan | | |
| 5 | Payoff of Second Mortgage Loan | | |
| 06 | | | |
| 07 | | | |
| 08 | Seller Credit | | |
| 09 | | | |
| 10 | | | |
| 11 | | | |
| 12 | | | |
| 13 | | | |
| **Adjustments for Items Unpaid by Seller** | | | |
| 14 | City/Town Taxes | to | |
| 15 | County Taxes | to | |
| 16 | Assessments | to | |
| 17 | | | |
| 18 | | | |
| 19 | | | |

#### CALCULATION

| Total Due to Seller at Closing (M) | $23,349.00 |
|---|---|
| Total Due from Seller at Closing (N) | |
| Cash ☐ From ☒ To Seller | $3,502.35 |

Lookup: Print Summary                1231807991                Page 1 of 2


**WYNDHAM**
VACATION OWNERSHIP

## New Proposal: Reference # 8333518-1 Selected

Tour Number: 44824090-A

**Name:** TIMOTHY SABELLA SR
Member Number:

Customer Initials   Customer Initials

Address:
USA

Home Phone:
Alternate Phone:
Date of Birth:

| | | | | Post Code | Email |
| | GROUND VALLEY | PA | 16420 | |

### Summary

**Selected Inventory**
Club Wyndham Access
CWA
00128-03-01

| Loan Information | Club Wyndham Plus Information |
| --- | --- |

**Gross Purchase Price**
$39,000.00

**Total Discount** $16,000.00
**Net Purchase Price $23,000.00**

Processing Fee $349.00
Processing Fee Collected $52.35
Down Payment $3,460.00
Down Payment Collected $3,502.35
MasterCard $3,502.35

**Total Down Payment $3,532.35**
(including closing costs & equity)

**ARDA-ROC Contribution Today:**
$0.00

Promotional Rate  None
Interest Rate  14.99%
Amount Financed  $19,846.65
Term Options  120
**Monthly Payment $322.13**

1st Payment Due  06/04/2018
Closing Costs  $30.00
  Filing Fees  $30.00
  Title Insurance  $0.00
**Total Monthly Payment $408.63**

**Total Points** 154,000
Bonus Points  246,000
Purchase Incentive  None
Exchange ID  RCI Partner
Gross Price / 1000 Pts:  $253.00
Today's Price / 1000 Pts:  $149.00
Club Wyndham Plus Fee Monthly
$86.50
Calculated Monthly Credit $0.00
Next Fee Payment Date  06/04/2018
Use Year  9/30
VIP Level  Silver

**Perks by Club Wyndham Information**

Perks Annual Renewal Fee: $59.95

**Associate Information**

| Sales Associate | Team Manager | T.O. |
| --- | --- | --- |
| 862 | | 18516 - ANDRE LAVIGNE |
| Pre | | |
| 617 | | |

**Contract Entry Use**

Inventory 00128-03-01
TRF-0
A/D 0.00

SD 0.00
AutoPay Credit Card
ARDA Contribution Today No

Tour Number 44824090
ATSL State PA
Marketed Package Yes



# WYNDHAM
## Quality Assurance Review

Name(s):     **Timothy Eric Sabella and Judy A Sabella**                Contract #:**00123-1807991**

Address:                                                          Member #:**00203461007**

Date:**04-20-2018**

Phone Number:                                    Email Address:

Inventory Name:  **CLUBWYNDHAM ACCESS VACATION OWNERSHIP PLAN**

Bonus Points:          **246,000**

End Date of Bonus Points       **09-30-2020**

## New Purchase Financial Details

| | | |
|---|---|---|
| Gross Purchase Price: | $ | **39,000.00** |
| Discount: | $ | **16,000.00** |
| Net Purchase Price: | $ | **23,000.00** |
| Closing Cost: | $ | **30.00** |
| Processing Fee: | $ | **349.00** |
| Total Purchase Price: | $ | **23,379.00** |
| Down Payment Today: | $ | **3,532.35** |
| Loan Payment Amount: | $ | **322.13** |
| Amount Financed: | $ | **19,846.65** |
| Term: | | **120** |
| Interest Rate: | | **14.99%** |

Interest Free option if you pay the loan balance of $ 19,846.65  within 30 days of the date listed on your contract. See 30 Days Interest Free Certificate for additional details.

Loan and Dues are subject to a billing charge if not paid through the approved Auto Pay Plan

## Club Wyndham Plus Maintenance Dues

| | | | | |
|---|---|---|---|---|
| Total Points - Today's Contract | **154,000** | | | |
| **Points Based Assessment** | | | Auto Pay | **Yes** |
| Club Wyndham Plus Program Fee | $ | **12.58** | First Payment Date | **06-04-2018** |
| HOA Fee and Real Estate Taxes | $ | **73.92** | | |
| **Total Assessment Amount** | $ | **86.50** | | |
| Frequency | | **Monthly** | | |

I have reviewed and agree with the information noted above.

| TIMOTHY ERIC SABELLA | 4/20/2018 | JUDY A SABELLA | 4/20/2018 |
|---|---|---|---|
| Owner's Signature: **Timothy Eric Sabella** | Date | Owner's Signature: **Judy A Sabella** | Date |

Owner's Signature:                          Date          Owner's Signature:                          Date

Wyndham Vacation Resorts, Inc.
Jesse Ibarra
By:
Authorized Representative of Seller

Contract No. **00123-1807991**

# Incentive Acknowledgment Disclosure

## CLUB WYNDHAM®PLUS BONUS POINTS
### Wyndham Vacation Resorts, Inc.

By purchasing a timeshare interest through Wyndham Vacation Resorts, Inc. (**"Wyndham"**), Buyer has the option to select:

CLUB WYNDHAM® PLUS BONUS POINTS

### BONUS POINTS:

Buyer will receive **246,000** CLUB WYNDHAM Plus Bonus Points (**"Bonus Points"**).

Bonus Points Use Period:          Start Date: **11-01-2018**
                                  End Date: **09-30-2020**

Buyer will also be eligible for CLUB WYNDHAM Plus VIP status through Bonus Points End Date: Yes____ No____

### Terms and Conditions

GENERAL:

1. Buyer may receive temporary CLUB WYNDHAM Plus VIP status depending upon the number of Bonus Points awarded combined with the number of points purchased. CLUB WYNDHAM Plus VIP status will remain in effect through the Bonus Points Use Period End Date, if applicable.

2. If Buyer cancels the timeshare purchase contract during the applicable cancellation period, the right to receive Bonus Points or the Bonus Play Vacation Package will be automatically cancelled without notice, penalty or obligation.

3. This benefit is not assignable or otherwise transferable by the Buyer.

4. Individuals should not purchase a vacation ownership interest in reliance upon the continued availability of this benefit. If all or a portion of the benefit described in the statement becomes unavailable as the result of events beyond the control of the Developer, the offering of such benefit may be terminated.

5. Buyer should not rely upon any representations other than those contained in this document, in the CLUB WYNDHAM Plus Program Guidelines, and the Bonus Play Vacation Package Terms and Conditions.

6. Wyndham Vacation Resorts, Inc., 6277 Sea Harbor Drive, Orlando, Florida 32821.

BONUS POINTS:

1. Bonus Points will be automatically awarded to the Buyer unless otherwise selected.

2. The Buyer's CLUB WYNDHAM Plus Membership must be in good standing in order to use Bonus Points.

3. Bonus Points entitle Buyer to reserve accommodations through the CLUB WYNDHAM Plus program between the Bonus Points Use Period Start Date and End Date. Reservations utilizing Bonus Points may not result in check-in occurring prior to the Use Period Start Date. Bonus Points cannot be renewed or extended beyond the Use Period End Date.

4. Bonus Points are subject to the terms and conditions of the CLUB WYNDHAM Plus Program Guidelines located in the CLUB WYNDHAM Plus Member's Directory (**"Directory"**). Buyer will also receive Housekeeping Credits and Reservation Transactions as described in the Directory. Bonus Points cannot be used for Advance Reservation Priority reservations.

No. 3073/Rev. 6-17

SAMPLE ONLY

# Ownership Certificate

## CLUB WYNDHAM®Access Vacation Ownership Plan

This certificate is issued by the PVTO Owners Association, Inc. and signifies the below owner(s) as a member(s) of the association with the right to participate in the CLUB WYNDHAM Access Vacation Ownership Plan.

Owner(s):   **Timothy Eric   Sabella and Judy A Sabella Joint Tenants With The Right Of Survivorship**

Issued this Day of_____ **April 20TH, 2018**

*Contract Number:_____ **00123-1807991**

Annual Or Biennial:_____ **Annual**

Number of Points _____ **154,000**

*This certificate supersedes any previously issued certificates for the above contract number.



Virtual Terminal

## *Wyndham Vacation Ownership*

**Date:** 04/20/18          **Time:** 06:25 PM

**Merchant Information:**  Wyndham Vacation Resorts
123 WVR Grand Desert

**Owner Information:**  SABELLA, JUDY

**Order ID:** 3015564214          **Account/Contract Type:** CWA          **Account/Contract Number:** 001231807991
**Status:** ACCEPT

| #  | Fee Type     | Amount       |
|----|--------------|--------------|
| 1  | CWA Fees     | 30.00 USD    |
| 2  | Down Payment | 3,502.35 USD |

**Total Amount:** 3532.35 USD
**Transaction Type:** Sale
**Payment Received By or Refund To:** Master Card
**Credit Card/Account Number:** ###########5679

X _Judy Sabella_                                                   APR 3 0 2018
**Signature of JUDY SABELLA**

Print Receipt

# ▽ WYNDHAM

|  | | Last Name | | Date | 4/20/2018 |
|---|---|---|---|---|---|
| | | | | Member Number | |
| | | | | New Contract Number | |

## Ownership Review

| | | | | |
|---|---|---|---|---|
| New Points Purchased Today* | 154,000 | | Permanent VIP Level | |
| Use Year/ Usage Period | Oct 1 - Sept 30    /   Annual | | Introductory VIP Level | Silver |
| Inventory Purchased | CWA | | | |

## Other Memberships and Enrollments

| | | | |
|---|---|---|---|
| External Exchange Company | RCI | Other | |
| Internal Exchange Company | CLUB WYNDHAM Plus | | |
| PlusPartners | yes | | |
| Perks by Club Wyndham | yes | | 800-251-8736 |
| Wyndham Rewards | yes | | 888-884-4321 - VIP |
| Club Pass | yes | | |
| One Year Price Freeze | yes | | |

Today's Incentive      246000 BONUS POINTS/ VIP SILVER FOR 2 YEARS/ RCI BENEFITS

## Your Financial Deposit Today

| | | | |
|---|---|---|---|
| Additional Deposit Today (form of payments) | 1 personal CC/check | $ | 3,532.35 |
| | 2 | $ | |
| | 3 | $ | |
| Total Deposit Applied to Contract Today | | $ | 3,532.35 |

## Quality Assurance Only

**Loan Summary**

| | | | |
|---|---|---|---|
| Loan Payment Amount for New Contract Today | | $ | 322.13 |
| Total Loan Balance with Wyndham on New Contract Today** | | $ | 19846.65 |
| Auto Pay      Yes | Auto Pay Method      personal CH/CC | | |
| First Payment Date on New Contract | 6/4/2018 | | |

**CLUB WYNDHAM Plus Summary (Maintenance Fee)**

| | | | |
|---|---|---|---|
| Amount for Today's Contract(s) | | $ | 85.50 |
| Auto Pay      yes | Auto Pay Method      personal checking/CC | | |
| First Payment Date | | | |

| | | |
|---|---|---|
| Loan Obligations financed today through Wyndham Rewards Credit Card and/or PayPal Credit. | $ | 0.00 |

I have reviewed and agree with the information noted above.

I agree that I will be a member of the programs noted above under "Your Other Memberships and Enrollments." (Certain programs may carry additional enrollment and renewal fees. Please refer to the disclosure documents for additional information.)

I have reviewed and understand the attached Buyer's Acknowledgment.

I agree that I will be a member of CLUB WYNDHAM Plus and that I have reviewed and agreed to the terms of the attached Assignment Agreement and Use Restriction.

I have reviewed and agree to abide by the terms and conditions of the Enrollment Agreement.

| | |
|---|---|
| Owners Name | Wyndham Quality Assurance Signature |
| Owners Name | Wyndham Quality Assurance Print Name |
| Site Contact #    (201 23 807991 | Site Contact Email |

*Points total does not include existing Bonus Point contracts
**Amount financed does not include any existing loan balances with any third party companies outside of today's purchase (i.e., PayPal Credit, Bill Me Later, Wyndham Rewards Credit Card)

Electronically Filed
5/4/2021 12:10 PM
Steven D. Grierson
CLERK OF THE COURT

1

**AOS**
G. MARK ALBRIGHT, ESQ. (#001394)

2  JORGE L. ALVAREZ, ESQ. (#014466)
**ALBRIGHT, STODDARD, WARNICK & ALBRIGHT**

3  801 South Rancho Drive, Suite D-4
Las Vegas, Nevada 89106

4  Tel:  (702) 384-7111
Fax:  (702) 384-0605

5  gma@albrightstoddard.com
jalvarez@albrightstoddard.com

6

7  and

8  Jonathan A. White, Esq.
Washington Bar No. 45442

9  **GRANITE SPIRE LAW GROUP, PLLC**
2003 Western Ave. Ste. 345

10  Seattle, WA 98121
T: (206) 494-3224 / F: (206) 770-7507

11  jwhite@granitespirelaw.com

12  *Attorneys for Plaintiffs*

13

**EIGHTH JUDICIAL DISTRICT COURT**

14

**CLARK COUNTY, NEVADA**

15

16  JUDY SABELLA, individually, and TIMOTHY
SABELLA, individually,

17

Plaintiffs,

18

19  vs.

20  WYNDHAM VACATION RESORTS, INC.;
JOHN DOES 1-50, and ROE CORPORATIONS 1-

21  15, inclusive.

22

Defendant.

23

CASE NO.:    A-21-833155-C

DEPT. NO.:    15

**AFFIDAVIT OF SERVICE**

24

25  **SEE ATTACHED**.

26

27

28

LAW OFFICES
**ALBRIGHT, STODDARD, WARNICK & ALBRIGHT**
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

LAS VEGAS, NEVADA 89106

1

**AFFIDAVIT OF SERVICE**

2

**EIGHTH JUDICIAL DISTRICT COURT FOR THE STATE OF NEVADA**
**CLARK COUNTY, STATE OF NEVADA**

3

4

JUDY SABELLA, individually, and TIMOTHY SABELLA, individually,

Case No.:A-21-833155-C
G. Mark Albright, Esq., Bar No. 001394
ALBRIGHT STODDARD WARNICK & ALBRIGHT

5

Plaintiff(s)

801 S. Rancho Drive Suite D-4
Las Vegas, NV 89106

6

v.

(702) 384-7111
*Attorneys for the Plaintiff(s)*

7

WYNDHAM VACATION RESORTS, INC.; et al.,

Client File# 11292.0080

Defendant(s)

8

9

I, Tanner Trewet, being sworn, states: That I am a licensed process server registered in Nevada. I received a copy of the Summons; Complaint, from ALBRIGHT STODDARD WARNICK & ALBRIGHT

10

That on 4/28/2021 at 3:10 PM I served the above listed documents to Wyndham Vacation Resorts, Inc. - c/o Corporate Creations Network, Inc., Registered Agent by personally delivering and leaving a copy at 8275 South Eastern Avenue, Suite 200, Las Vegas, NV 89123 with Marcia Wyatt - Receptionist, a person of suitable age and discretion, authorized by Registered Agent to accept service of process at the above address shown on the current certificate of designation filed with the Secretary of State.

11

12

That the description of the person actually served is as follows:
Gender: Female, Race: Caucasian, Age: 40's, Height: Seated, Weight: N/A, Hair: Red, Eyes:Blue

13

14

15

16

17

18

19

I being duly sworn, states: that all times herein, Affiant was and is over 18 years of age, not a party to or interested in the proceedings in which this Affidavit is made. I declare under penalty of perjury that the foregoing is true and correct.

20

Date:  5/3/21

21

22

(No Notary Per NRS 53.045)

23

Tanner Trewet
Registered Work Card# R- 2019-07712
State of Nevada

Service Provided for:
Nationwide Legal Nevada, LLC
626 S. 7th Street
Las Vegas, NV 89101
(702) 385-5444
Nevada Lic # 1656

24

25

26

27



28

Control #:NV241223
Reference: 11292.0080

Electronically Filed
4/19/2021 5:32 PM
Steven D. Grierson
CLERK OF THE COURT

1  **IAFD**
   G. MARK ALBRIGHT, ESQ. (#001394)
2  JORGE L. ALVAREZ, ESQ. (#014466)
   **ALBRIGHT, STODDARD, WARNICK & ALBRIGHT**
3  801 South Rancho Drive, Suite D-4
   Las Vegas, Nevada 89106
4  Tel:  (702) 384-7111
   Fax:  (702) 384-0605
5  gma@albrightstoddard.com
   jalvarez@albrightstoddard.com
6

7  and

8  Jonathan A. White, Esq.
   Washington Bar No. 45442
9  **GRANITE SPIRE LAW GROUP, PLLC**
   2003 Western Ave. Ste. 345
10 Seattle, WA 98121
   T: (206) 494-3224 / F: (206) 770-7507
11 jwhite@granitespirelaw.com

12 *Attorneys for Plaintiffs*

13                **EIGHTH JUDICIAL DISTRICT COURT**

14                   **CLARK COUNTY, NEVADA**

15

16 JUDY SABELLA, individually, and TIMOTHY          CASE NO.:
   SABELLA, individually,
17                                                  DEPT. NO.:
                     Plaintiffs,
18
   vs.
19
20 WYNDHAM VACATION RESORTS, INC.;              **INITIAL APPEARANCE FEE**
   JOHN DOES 1-50, and ROE CORPORATIONS 1-           **DISCLOSURE**
21 15, inclusive.
22
                     Defendant.
23

24        Pursuant to NRS Chapter 19, as amended by Senate Bill 106, filing fees are submitted for

25 parties appearing in the above-entitled action as indicated below:

26 **PLAINTIFFS**:

27     JUDY SABELLA                                        $270.00

28     TIMOTHY SABELLA                                       30.00

CASE NO: A-21-833155-C
Department 15

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106
LAS VEGAS, NEVADA 89106

1

2                              TOTAL REMITTED:   $300.00

3

4 DATED this 14ᵗʰ day of April, 2021.

5                              **ALBRIGHT, STODDARD, WARNICK & ALBRIGHT**

6

7                              G. MARK ALBRIGHT, ESQ. (001394)

8                              JORGE L. ALVAREZ, ESQ. (014466)
                              801 S. Rancho Drive, Suite D-4

9                              Las Vegas, Nevada 89106
                              Tel: (702) 384-7111

10                             Fax: (702) 384-0605
                            gma@albrightstoddard.com

11                             jalvarez@albrightstoddard.com

12                             and

13                             Jonathan A. White
                            Washington Bar No. 45442

14                             **GRANITE SPIRE LAW GROUP, PLLC**
                            2003 Western Ave. Ste. 345

15                             Seattle, WA 98121
                            T: (206) 494-3224 / F: (206) 770-7507

16                             jwhite@granitespirelaw.com

17                             *Attorneys for Plaintiffs*

18

19

20

21

22

23

24

25

26

27

28

ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
LAW OFFICES
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

LAS VEGAS, NEVADA 89106